## JOHN J. SESNON CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1910.)

### Nos. 1,797, 1,798.

1. INTERNAL REVENUE (§ 4*)—STATUTES—CONSTRUCTION.

Revenue laws imposing license taxes on different kinds of business are to be liberally construed, to carry out the purposes of their enactment; their penal provisions not being penal in the sense that requires a rigidly strict construction.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 4, 5; Dec. Dig. § 4.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WHARVES (§ 4*)—"WHARF."

A "wharf" is a space of ground artificially prepared for the reception of merchandise from a ship or vessel, so as to promote the convenient loading and discharge of the vessel; a structure used for the handling of freight in connection with the shipment or discharge of a cargo from a vessel; an artificial landing place. It need not be of any particular design; the only necessity being that it affords a place where vessels land.

[Ed. Note.—For other cases, see Wharves, Cent. Dig. § 2; Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 8, p. 7433.]

3. INTERNAL REVENUE (§ 9*)—"PUBLIC WHARF."

Act March 3, 1899, c. 429, § 460, 30 Stat. 1336, provides that any person maintaining public docks, wharves, and warehouses in Alaska shall first obtain a license and pay a license fee of $100 per annum. By Act June 6, 1900, c. 786, § 29, 31 Stat. 330, 331, this provision was amended so as to impose a license tax on public docks, wharves, and warehouses of 10 cents per ton on freight handled or stored. Defendant operated a lighterage business in Nome, consisting of an aerial tramway operated from towers anchored on permanent concrete foundations several hundred feet out to sea. Along this tramway cargoes were discharged from vessels by means of lighters; defendant contracting with each vessel for lighterage services at an agreed price per ton. *Held*, that such structure constituted a "public wharf," which defendant had no right to operate without payment of the fee.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 6, p. 5838.]

4. INTERNAL REVENUE (§ 9*)—WHARVES—"FREIGHT HANDLED."

Defendant maintained a wharf structure at Nome, and was also engaged in the sale of coal for the joint account of itself and the seller. Defendant guaranteed the seller's advances in a sufficient sum to realize a net profit of 50 cents a ton on the coal sold and a further interest in the net proceeds of the sale of the coal and the profit in excess of 50 cents a ton; defendant regulating the selling price of the coal. *Held* that coal handled under such contract from vessels by means of defendant's wharf structure constituted "freight handled," within Act June 6, 1900, c. 786, § 29, 31 Stat. 330, 331, requiring persons maintaining public docks, wharves, and warehouses in Alaska to pay a license fee of 10 cents per ton on freight handled or stored.

[Ed. Note.—For other cases, see Internal Revenue, Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 4, pp. 2973–2976.]

In Error to the District Court of the United States for the Second Division of the District of Alaska.

The John J. Sesnon Company was convicted of operating a public wharf in Alaska without a license, and it brings error. Affirmed.

These were criminal actions separately brought by the United States against the John J. Sesnon Company, a corporation of the state of California, in the District Court for the Second Division of the District of Alaska, upon information of the district attorney charging the corporation with the offense of prosecuting and attempting to prosecute the business of a public wharf at Nome, Alaska, without first having applied for and obtained a license so to do, as required by law. It is charged that while conducting said public wharf defendant handled on certain dates specific amounts of freight, on which it was required to pay, but did not pay, the sums due the United States as a license. The defendant entered a plea of not guilty in each case. The material facts are as follows:

The John J. Sesnon Company, the defendant, is a corporation organized under the laws of the state of California and doing business in the district

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of Alaska, engaged principally in the business of lighterage at the Nome roadstead; that is to say, the business of transferring cargoes from the sides of the ships lying in the roadstead to a landing place on shore. Its plant covers considerable ground at and in the town site of Nome, Alaska, and its facilities for quick and safe dispatch in transferring cargoes from ship to shore and the distribution and delivery to consignees on shore are extensive and complete; an aërial tramway being operated between towers anchored on permanent concrete foundations, one located several hundred feet inshore and the other located several hundred feet out in the sea. There is a distance of 1,400 feet between the towers, with an aërial tramway operated between them by means of steam power ashore. The modus operandi is to take a barge alongside of the vessel lying at anchor in the roadstead. Onto this barge the cargo is discharged from the vessel. The barge is then towed by a tug from the ship's side to a point where the barge can safely float under the aërial tramway. A portable platform on the barge is then loaded with the cargo and lifted from the barge by means of the tramway, and thence carried by means of a traveler on the tramway to a point inshore immediately over a permanent platform or landing, onto which the portable platform with the cargo is lowered and landed, and there the cargo is distributed to the consignees; the outer or seaward end of the permanent platform or landing being on the shore, but considerably above and inshore of high water of Behring Sea, so that there is dry land between the outer edge of the platform and high-water mark of Behring Sea.

At the trial it was admitted by stipulation in case No. 1,797 that the defendant was a corporation; that on May 29, 1909, at Nome, it lightered from the steamship Corwin to the shore 62.7 tons of freight by means of a cable-way, which freight was consigned to various corporations and individuals in Nome, and was landed and delivered to the various consignees. In case No. 1,798 it was stipulated that the defendant lightered from the British steamship Puritan by its cableway 600 tons of coal consigned to itself in accordance with the terms of its contract with the Pacific Coast Coal Company; that said coal was received by defendant for sale by it in accordance with the terms of said contract. It is undisputed that the defendant did not in either case pay any license for conducting a public wharf, and never applied for such license, and that no such license was ever granted.

At the close of the testimony the defendant interposed a motion for an instructed verdict of not guilty, which motion the court denied. The jury returned a verdict of guilty, and a judgment was entered thereon, ordering the defendant to pay a fine of $6.27 and costs in case No. 1,797 and $60 and costs in case No. 1,798.

Ira D. Orton and William H. Gorham, for plaintiff in error.

George B. Grigsby, U. S. Atty., and Jas. W. Bell, Asst. U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The controversy in these two cases turns mainly upon the question as to what constitutes the act of "prosecuting or attempting to prosecute the business of handling freight in connection with the use of a public wharf."

By the "Act to define and punish crimes in the district of Alaska and to provide a Code of Criminal Procedure for said district," approved March 3, 1899 (Act March 3, 1899, c. 429, 30 Stat. 1253, 1336), it was provided in section 460:

"That any person or persons, corporation or company prosecuting or attempting to prosecute any of the following lines of business within the district of Alaska shall first apply for and obtain license so to do from a district court or a subdivision thereof in said district, and pay for said license for the respective lines of business and trade as follows, to wit: * * * Public docks, wharves, and warehouses, one hundred dollars per annum."

By the "Act making further provision for a civil government for Alaska, and for other purposes," approved June 6, 1900 (Act June 6, 1900, c. 786, § 29, 31 Stat. 321, 330, 331), the provision above cited, describing the lines of business subject to a license, was amended to read as follows:

"Public docks, wharves, and warehouses, ten cents per ton on freight handled or stored."

This statute is a revenue statute, and must be construed in accordance with the rules of construction applicable to such a statute. A thing may be within the letter of a statute and not within its meaning, and within its meaning though not within its letter. The intention of the lawmaker is the law. The revenue laws are to be construed liberally, to carry out the purposes of their enactment. Their penal provisions are not penal in the sense that requires a rigidly strict construction. Where doubt exists as to the meaning of the statute, the title may be looked to for aid in its construction. Pre-existing law and the reason and purpose of the new enactment are also considerations of great weight. United States v. Hodson, 77 U. S. 395, 406, 19 L. Ed. 937; Smythe v. Fiske, 90 U. S. 374, 380, 23 L. Ed. 47. Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion. Lau Ow Bew v. United States, 144 U. S. 47, 59, 12 Sup. Ct. 517, 36 L. Ed. 340.

The intention of Congress as expressed in the act of June 6, 1900, was to levy a license tax upon the prosecution of the business of handling freight in connection with a public dock, wharf, or warehouse, and to the extent of the use of such structure for that purpose. If no freight was handled in connection with such a structure, there was no license tax. No license tax was imposed upon the mere structure itself. The statute differs in this respect from the previous act of March 3, 1899. In that act the license was levied upon the prosecution of the business of the structure, whether it was used more or less for the handling of goods and merchandise. Its use was not the measure of liability for the license tax. The business of maintaining a public wharf was sufficient to make the owner liable for the license tax of $100 per annum, without regard to the amount of business transacted in the use of such wharf. In the last act the liability for the tax turns upon the question whether there is a handling of freight in connection with the wharf structure, and not the mere existence of the structure open to business.

In Bouvier's Law Dictionary the word "wharf" is defined as:

"A space of ground artificially prepared for the reception of merchandise from a ship or vessel, so as to promote the convenient loading and discharge of such vessel."

A wharf, under this section and as thus defined, is therefore a structure used for the handling of freight in connection with the shipment or discharge of a cargo from a vessel; in other words, an artificial landing place.

"The construction of a structure, in order to come within the designation of a wharf, need not be that of any special design, as that of the ordinary

wharf, composed of a platform resting upon spiles, which is commonly used by vessels in harbors and seaports. The only necessary requirement for a place where vessels land to be termed a wharf is that there must be some artificial improvement, as distinguished from a mere unimproved natural landing place on the banks or shores of a river, harbor, or bay, as the case may be." 30 Am. & Eng. Encyc. p. 470.

In the handling of freight and passengers between the ship and shore under the conditions prevailing at Nome, defendant's structure answers every requirement of a wharf, if, indeed, it is not the only kind of a structure extending into the sea that can at that place render an efficient and economical wharf service.

It is next contended that the structure is not a public wharf. This was a question of fact for the jury. There was evidence tending to show that defendant had and would enter into a contract with any corporation, steamship company, or water craft of any kind or description for the handling of freight between the vessel and shore, for which a charge was made of 50 cents to $1.50 per ton according to conditions; that is to say, the contract rates were governed by the nature of the freight handled and other prevailing conditions. The objection is that there was no evidence tending to show an intention on the part of the defendant to dedicate the structure to the use of the public, or its acceptance on the part of the public, or its dedication by public authority. We think the evidence that the defendant would make a contract, and did make contracts, with any one for the use of the structure in handling freight between ship and shore, and the general acceptance of that service by the public, was evidence sufficient to go to the jury upon that question. The fact that the defendant insisted upon a contract before rendering the wharfage service did not make the service any less a public service.

The case of Weems Steamboat Co. v. People's Co., 214 U. S. 345, 29 Sup. Ct. 661, 53 L. Ed. 1024 is cited as authority in support of the objection that the evidence in the present case is not sufficient to show that defendant's wharf is a public wharf. In that case the action was in equity on the part of the complainant, engaged in transporting passengers and freight, to restrain the defendant, engaged in the same business, from using certain wharves of the Rappahannock river, in the state of Virginia, of some of which the complainant was the owner in fee, and of others the lessee of the exclusive use from the owners. The defendant was neither owner nor lessee of any of the wharves. The complainant contended that it had the exclusive right to the use of such wharves, either as owner or as lessee; that the defendant, illegally and against the will of the complainant, insisted upon using them to carry on its business, although offering to pay complainant what was the reasonable value of the defendant's use of such wharves. The matter was referred to a special master to ascertain what rights passed to the complainant with the acquisition of such wharves, and whether or not the wharves were public or private wharves. The master took evidence, and upon such evidence reported in favor of granting the injunction, on the ground that the wharves in question were all private wharves, owned or leased by the complainant, who had the exclusive right to their use as landing places. There was no ques-

tion as to the public character of these wharves in the handling of freight for the general public, or for whosoever would pay the charges.

If the controversy in the present case was between the defendant and some shipowner, whom the defendant had refused to serve upon the same terms that it served itself, upon the grounds that it was maintaining a private and not a public wharf, this case might be an authority on the question involved in such a controversy. But in this case there is no such controversy, and there is no evidence that the defendant refused to serve all vessels alike under the same conditions; on the contrary, the evidence tends to show that the defendant is serving all vessels and corporations alike, and that it is ready to make contracts with others for a like service.

W. B. Watts, defendant's manager, was called as a witness by the United States in both cases. He testified in case No. 1,797 as follows concerning the defendant's use of the structure:

"A. * * * The John J. Sesnon Company handles the freight of any steamship that brings cargo to this (Nome) port with whom our company makes a contract.

"Q. And the John J. Sesnon Company engages in a general lighterage business does it not?

"A. Not in general. We do a lighterage business for any ships we have a contract with. I don't suppose it is general in the term you mean it. We do lighterage business, not for everybody that comes along there, but for ships we have contracts with.

"Q. Now, you lighter for any company, or any steamship, or water craft of any kind or description, that might enter into a contract with you and pay your prices, do you not?

"A. Yes.

"Q. And as a matter of fact your company handled all the freight from all the ships coming to this port during the present year, has it not?

"A. Yes; I think we have.

"Q. Have you any schedule of prices for handling freight and lightering?

"A. Why, I guess we have.

"Q. Have you a minimum and maximum rate?.

"A. No; we haven't.

"Q. Then your contracts differ with these various corporations that you handle freight for?

"A. Yes; they do.

"Q. What is that variation?

"A. Well—according the contracts are made on the outside—probably fifty cents to the ton, something of that kind, or small lots maybe more than that.

"Q. What is that?

"A. Fifty cents to the ton; perhaps more than that; maybe fifty cents to a dollar and a half, according to conditions.

"Q. The contracts are governed by the nature of the freight handled, somewhat, are they not?

"A. Yes, sir.

"Q. They have been engaged in business for several years?.

"A. Yes.

"Q. And the principal business is that of lightering cargoes from ships?

"A. And the sale of coal."

He testified substantially to the same effect in case No. 1,798.

The cases were submitted to the jury mainly upon the question as to what constituted a public wharf. After the jury had been out some time in case No. 1,797, it returned into court and asked for further instructions as to what constituted a public wharf. The court in-

structed the jury as follows. The instructions are substantially the same as the first instructions.

"The question whether the wharf conducted by the defendant was a public or private one depends on how the company has conducted it on the day stated in the information. Were they receiving freight as a lighterage company and as wharfinger indiscriminately from all persons who applied for that accommodation, and charging tolls therefor, why then it may be public; if they were discriminating, or refusing freight from some and accepting it from others, then, of course, it would not be a public wharf. The business of conducting a wharf is a business incident and part of the lighterage business, and you will remember that if they, as a lighterage company, received freight, without any discrimination, as to persons, or as to consignees, from all persons, all comers, all those who applied for the benefit of their lighter plant and their lighter services, why, then, it was a public wharf. If they only landed freight for their own purposes, for their own uses, why, then, of course, it would be a private wharf, and would not be subject to a license."

These were substantially the instructions in case No. 1,798. We do not think there was any error in these instructions.

In case No. 1,798 defendant objects to the payment of a license tax on the 600 tons of coal consigned to itself. It appears from the evidence that the coal was received by the defendant at Nome under a contract with the Pacific Coast Coal Company, under which the coal was to be sold by the defendant for joint account of the parties to the contract. The Pacific Coast Coal Company was guaranteed its advances and a sufficient sum to realize a net profit of 50 cents per ton on the coal sold, and it had a further interest in the net proceeds of the sale of the coal in a profit in excess of 50 cents per ton. The selling price of the coal was regulated by the defendant. We see no reason why the coal should be exempt from the license tax. It was "freight handled" by defendant's wharf structure, and under the statute it is "freight handled" that fixes the amount of the license tax.

Finding no reversible error in the records, the judgments in both cases are affirmed.