## JUNEAU FERRY & NAVIGATION CO. v. MORGAN et al.

(Circuit Court of Appeals, Ninth Circuit. September 5, 1916.)

No. 2732.

MUNICIPAL CORPORATIONS ☜719(4)—WHARVES—POWER TO LEASE.
In the absence of specific legislative authority, beyond that conferred by Comp. Laws Alaska, 1913, § 627, which authorized it to construct and maintain wharves, a municipal corporation in Alaska has no power to lease a wharf owned by it to a ferry company for its exclusive use.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1532; Dec. Dig. ☜719(4).]

Appeal from the District Court of the United States for the First Division of the District of Alaska; Robert W. Jennings, Judge.

Suit in equity by C. P. Morgan, R. B. Cochran, and H. Johansen, copartners as the Island Ferry Company, against the Juneau Ferry & Navigation Company. Decree for complainants, and defendant appeals. Reversed.

J. H. Cobb, of Juneau, Alaska, for appellant.

George Irving and Z. R. Cheney, both of Juneau, Alaska, for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The complaint of Morgan and others, appellees here, to be called plaintiffs, doing business as the Island Ferry Company, of Alaska, sets up that on November 1, 1915, the common council of the town of Douglas, Alaska, leased to them a certain float and premises, and that plaintiffs took possession under the lease, but that on November 13, 1915, the defendant, operating a ferry between Juneau and Douglas, Alaska, wrongfully entered upon the float and premises by landing its boat thereat for the pur-

pose of discharging freight and passengers to the exclusion of plain-tiffs.

The lease was executed by the city of Douglas, a municipal corporation, by Peter Johnson, president of the common council and ex-officio mayor, to the Island Ferry Company for certain premises owned and controlled by the town and described as:

"That certain float and landing adjoining the city dock on the north side of the same, together with all piling and structures incident and appurtenant to the same and necessary for the maintenance of said float; and also the gang-way and necessary approaches to said float with the right of ingress and egress to and from said float by land and water."

The lease runs for a year from November 1, 1915, at an annual rental of $300 payable in monthly installments. The lessees agreed to keep the premises in clean condition in accordance with the ordinances of the town, and at the end of the time are to yield up the property in good condition. There was a covenant not to sublet or sell or assign without the consent of the town.

The defendant, Juneau Ferry & Navigation Company, answered, contending, substantially, that the lease was executed without authority; that the float involved was a part of the public dock on the navigable waters of Gastineau Channel constructed by the municipality of the city of Douglas, Alaska, some time previous; that there was no authority in the city council to grant a special or exclusive privilege to any person; and that it was the purpose of the common council and of the lessees to create a special privilege and operation for the ferryboat belonging to the lessees, and especially to the detriment of the business of the Juneau Ferry & Navigation Company.

At the hearing it appeared that several years before this controversy arose the town of Douglas built a dock and a float, the float being about 40 feet long and resting in the water on the north side of the dock, but that, as the winds and seas came upon the float as it was situated, the city took it from the north side and put it on the south side of the dock, added to it, and kept it for public uses. About the time that this was done, a man named Murray had a float which was useless to him, and he gave it to the town. The officials of the town took this given float and put it on the north side of the city dock. The Juneau Ferry & Navigation Company, appellant, used the float on the south side, to which the public has access. The real purpose of putting the float on the north side was to encourage a ferry in opposition to that operated by the Juneau Ferry & Navigation Company, the object being stated by a member of the city council in this language:

"Q. And tell the court positively now, if you can, just what the float was built for; make it a precise answer. A. It was built for lease or rent for the benefit of the city of Douglas and for the citizens of Douglas.

"Q. For the purposes of an independent ferry? A. Independent ferry; yes, sir.

"Q. Why was that done? A. Well, in the first place, we thought it a good investment; in the second place, to reduce the fare between Douglas and Juneau.

"Q. And you as councilman at that time were acting for the public good? A. People of Douglas; yes, sir."

The south float was for landing, and open to everybody, ferries or individuals; and, while the south float is larger and more sheltered, the evidence .tends to show that the north float is more convenient for landing.

The Juneau Ferry & Navigation Company used a dock and a float of their own on the south side. The .evidence also tends to show that, after the lease of the float on the north side to the Island Ferry Company, some of the boats of the Juneau Ferry & Navigation Company were landed at the north float, and that there was more or less interference by the Juneau Ferry & Navigation Company with the exclusive enjoyment of the leased property.

The evidence is that the effect of leasing the north float to the Island Ferry Company was to bring about a competition with the Juneau Ferry & Navigation Company boats and a reduction in the cost of ferriage which, naturally, operated advantageously to the public.

The lower court granted injunction restraining the Juneau Ferry & Navigation Company from landing its boats at the float on the north side of the dock or in any wise trespassing or occupying the same. The Juneau Ferry & Navigation Company appeals.

That the premises leased constituted a wharf is fairly within our decision in Sesnon Company v. United States, 182 Fed. 573, 105 C. C. A. 111. The real question involved, therefore, is: Had the municipality power to enter into the lease of the public float or dock with the necessary approaches thereto?

The grant of power to municipalities in Alaska with respect to wharves is in the following clause:

"That the said common council shall have and exercise the following powers: * * * Fourth, to provide for the location, construction, and maintenance of the necessary streets, alleys, crossings, sidewalks, sewers, and wharves." Section 627, Compiled Laws of Alaska.

We are not advised of any further expressed powers.

The rule is that the power to lease corporate property held by a municipality for public use cannot ordinarily be wholly or partly diverted to a possession or use exclusively private without specific legislative authority, and that a town cannot lease a part of a public dock to a private concern, nor can a city which has condemned private property for use as a wharf lease it unconditionally for a term of years to be used in the prosecution of private business and for private gain. McQuillin on Municipal Corporations (1912) § 1145.

In People's Railroad v. Memphis Railroad, 10 Wall. (77 U. S.) 38, 19 L. Ed. 844, it was laid down that municipal corporations are doubtless invested with subordinate legislative powers to be exercised in the passage of ordinances for local purposes connected with the public good, but they are merely derivative, and are subject at all times to the legislative control, and the general rule is that powers given to municipal corporations cannot be delegated to others nor be effectually abridged by any act of the municipal corporation without the express authority of the Legislature. And it was there held that such corporations invested with the power to lay out, open, alter, repair,

and amend streets within the corporate limits cannot, without more power, grant to an association of persons the right to construct and maintain for a term of years a railway in one of the streets of the municipality for the transportation of passengers for private gain, and that an ordinance or resolution of the authorities granting ·such right is void.

In Meriwether v. Garrett, 102 U. S. 472, 26 L. Ed. 197, the general doctrine applicable was stated by the Supreme Court as follows:

"In its streets, wharves, cemeteries, hospitals, courthouses, and other public buildings, the corporation has no proprietary rights distinct from the trust for the public. It holds them for public use, and to no other use can they be appropriated without special legislative sanction. It would be a perversion of that trust to apply them to other uses. The courts can have nothing to do with them, unless appealed to on behalf of the public to prevent their diversion from the public use."

In Illinois & St. Louis Railroad & Canal Co. v. St. Louis, Fed. Cas. No. 7007 (12 Fed. Cas. 1199), Judge Dillon held that an ordinance, by which municipal authorities undertook, without express legislative authority therefor, to surrender to a private corporation or person their control over a public wharf for a fixed period, that is, the right to occupy a portion of the public wharf with a grain elevator for fifty years, without reserving right to resume possession and regulate charges, was void.

In People ex rel. Swan v. Doxsee, 136 App. Div. 400, 120 N. Y. Supp. 962, the Supreme Court of New York had this case before it: The town of Islip was authorized to purchase docks and to acquire sites and to build docks and bulkheads for public use, and the trustees of the town were given by law supervision of docks and landing places with the power to prescribe rules and regulations for the use thereof by the public. The town bought a dock and took title, to be held for the use of the town. Previous to the acquisition of the dock by the town of Islip, a corporation had maintained upon it an icehouse and platforms by agreement with the then owner. When the town acquired it, the trustees of the town entered into a lease granting to the corporation the exclusive use of those portions of the dock occupied by its structures for a term of ten years at an annual rental of $100. A proceeding was brought to require the trustees to remove the icehouse structure of the corporation from the dock on the ground that it was an unlawful obstruction to the public use of the dock. The Supreme Court said:

"The broad question brought up by this appeal is whether a municipality may by leave or license permit property acquired or held by it for 'the public use' to be wholly or partly diverted to a possession or use exclusively private without specific legislative authority."

In considering the question, the court treated the icehouse in question as not interfering with any then present actual demand or necessity of the public use, and regarded the position of the relator as presenting the point that the existence of the icehouse constituted an interference pro tanto with the public right to the use of the entire wharf. It was decided that the trustees of the town holding the wharf for

public use had no power to permit a corporation or person to maintain any structure on the public dock for its exclusive private use. The court mentioned the fact that by the early statutes of the state of New York the public authorities were given power to lease, not the wharves themselves, but simply the right to collect wharfage, and that even under such leases it had been held unlawful to obstruct free passage over the wharf by the erection of any structure thereon of a private nature. The court cited the case of City of St. Paul v. Chicago, etc., Railroad Co., 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L. R. A. 184, as holding that, while there is a difference in the use of a public street and that of a public wharf to the extent that on a public wharf it might be permitted to erect a structure for the receipt, delivery, or temporary storage of goods while in transit, provided it were common to the use of all on the same terms, it would at the same time be unlawful to give a particular person or corporation the right to occupy a levee as a site for its warehouse solely for its own business and to the exclusion of the general public.

"It seems clear, * * *" continued the court, "that the dock in question which is under the charge of the respondents was acquired and is held for a general public use for landing purposes, and that such public use is the primary use for which it was acquired and is maintained. To permit any part of it to be occupied exclusively by an icehouse structure used for a purely private business is a violation of the public right and of the statutory duty imposed upon the respondents to regulate the use of the wharf for and by the public. The whole wharf is held for the public use, and not simply a part of it. Sound public policy forbids that there should be any power to divert a part thereof to a private use; for, once such power being assumed, the dangers which may follow either from favoritism or ill judgment may speedily hamper or practically destroy the fundamental purpose of the public use."

Bateman et al. v. City of Covington, 90 Ky. 390, 14 S. W. 361, decided in 1890 by the Court of Appeals of Kentucky, is very close to the instant case. The city of Covington leased to Bateman and another for five years a part of its wharf on the Ohio river, a small strip of land between the river and a parallel street. Under the terms of the lease the lessees were given complete control of the wharf, binding themselves to use the ground for wharf privileges only. Upon a test of the power of the city, the court held that there was no authority in the city to make such a contract, or to deprive the public of the use of the wharf, and said in this connection:

"We perceive no authority in the city charter or any legislative enactment empowering the city to make such a contract, or to deprive the public of its use. The city has the power to impose certain duties upon those availing themselves of wharf privileges, and to make such regulations as may be necessary to keep the wharf in repair for public use; but it has no power to confer such absolute control to an individual who leases it for his own private use. The city must control the use, and for this purpose may place the ground in charge of a wharfmaster, or some agent who acts for the city, that the public may enjoy the use. A city has the exclusive control of its streets, and a like control over its wharfs; and, in appropriating the use of either for the benefit of a private person, to the exclusion of the public, it is going beyond its power, and such a contract is void. The city is a mere trustee for the public, and all have the right to use streets and wharfs; one citizen having the same right as another. 2 Dill. Mun. Corp. §§ 659–661. When a city undertakes to confer on a private individual such a right in streets or wharfs,

without legislative authority, as will produce a conflict between the public and the private use, the act is ultra vires; and, as said in the case of City of Louisville v. Bank, 3 B. Mon. 138: 'It would be almost as reasonable to sell and appropriate as private property the river itself as the ground lining its margin. The object of the town or the city owning this ground is to benefit its facilities as a highway.' In this case, the right to the use or control is, in effect, abandoned by the city, and the right to the possession claimed by the appellants on the one side, and Shinkle on the other. * * * The use and control of public highways, such as streets and wharves, etc., belonging to the city, cannot be surrendered by contract to a private individual, to the exclusion of the public. Such highways are public property, intended for public use, and placed under the control of the city government for the benefit of the public; and any other disposition of such property, without special authority conferred by the lawmaking power, must be disregarded."

The rule of the Kentucky case was formulated in a case less doubtful than the present one, for in the lease there considered the lessees were obligated to use the ground for wharf privileges only; whereas, under the terms of the Douglas lease, the city has endeavored to surrender control of the float and its approaches without requiring any obligation from the lessees to use the premises leased for any designated purpose. As the lease reads, there is nothing to prevent the lessees from ceasing to use it for ferriage purposes, or, if they use it for ferry purposes, from exacting any tolls they see fit to demand from persons whom they transport. Such a transfer of exclusive use and control we believe to be in excess of the power of the town. We do not wish to be understood, however, as holding that it is not within the power of the town to lease wharf privileges for such a purpose as was apparently contemplated in the execution of the lease herein involved, namely, to furnish to the traveling public a convenient and economical landing place. But there cannot lawfully be what in effect is an abandonment by the town of the right to control and regulate. Macdonnell v. I. & G. N. R. Co., 60 Tex. 590.

The order of injunction must be reversed. So ordered.