[No. 22986. Department Two. May 14, 1931.]

JOHN E. BARNETT, *Respondent,* v. W. S. LINCOLN *et al.,*
*Appellants.*[1]

*Bradford & Snyder* and *Bogle, Bogle & Gates,* for
appellants.

*Preston, Thorgrimson & Turner* and *McMicken,
Ramsey, Rupp & Schweppe,* for respondent.

BEELER, J.—This is an appeal from a decree holding
invalid a written contract entered into between Salmon
Terminals, a domestic corporation, and the Port of

[1]Reported in 299 Pac. 392.

Seattle, a municipal corporation, and enjoining the port from turning over the use and possession of certain of its properties to the Salmon Terminals. The sole question presented is: Did the port have the power—the legal right—to make the contract?

The contract is too extended to be set forth in full. Its pertinent provisions are: "The port of Seattle offers to Salmon Terminals the use of certain of its property," consisting in part of sheds used as warehousing space for

" . . . *storing,* handling and shipping canned salmon, canned sea foods, cannery supplies, fish products, by-products, and all supplies and equipment incidental to cannery operation."

The property, the use of which the port undertook to give Salmon Terminals, embraces "334,400 square feet of warehouse space on pier 40," also "the use of certain waterway areas, and the streets and railroads serving the said pier 40." The Salmon Terminals "is to have *preference* over outside business in berthing space and use of wharves." The Salmon Terminals "shall furnish and keep in repair the movable equipment." The port "assumes responsibility for the maintenance and repair of buildings, roof-structures, and roof."

The Salmon Terminals

" . . . assumes responsibility for loss, damage, or injury to the premises caused by its employees, invitees, or licensees, or by any vessel or craft while docking at, lying alongside of or departing from the premises in connection with the company's business, or by its occupancy of the premises other than by reasonable wear and tear or fire."

The Salmon Terminals

" . . . will bear the expenses of operation, including water, light, heat, watchman, and employees; *wharf to be operated by the company,* including the

warehousing, trucking, and all other labor involved in the handling and storage of canned salmon.''

The Salmon Terminals

'' . . . will collect upon all its business and the freight handled by it or its agents, wharfage, storage, handling, and dockage charges as fixed by the port's established tariff,''

which ''full tariff rate'' collected on general cargo ''shall be paid to the port,'' and ''seventy-five per cent of the full tariff charges for wharfage and storage on canned salmon, canned sea foods, etc.'' And

'' . . . it is further understood and agreed that the revenues of the port for wharfage and storage on freight handled by the company over the premises here assigned, including the *rental* at the rate of five cents per square foot per month for the area set off for offices, lockers, etc., shall not be less than fifty thousand dollars in any one year.''

The contract further provides that, in the event the buildings situated on the premises should be totally or partially lost or destroyed by fire or other casualty so ''as to render them *untenantable* in whole or in part,'' then ''it shall be optional with the port to rebuild the same'' and the Salmon Terminals ''shall have the right to declare the contract terminated by written notice served on the port,'' unless the port shall, ''within ten days after such loss or damage, notify the company in writing of the port's intention to rebuild or restore such premises.'' During such period of rebuilding, repairing or restoring

'' . . . · the $50,000 minimum payment to the port shall be abated in the same ratio as the portion of the premises rendered for the time being unfit for occupancy shall bear to the whole premises.''

''OFFICE SPACE: The company shall pay the port as *rental* for the space specifically set forth for offices, lockers, etc. (upon which no return can be made

other than from *rentals*) the rate of five cents per square foot per month for the respective areas so set off."

The agreement "shall be in effect for a period of five years from and after March 1, 1930," and the Salmon Terminals "has the option to renew this agreement for a like period under the same terms and conditions." The Salmon Terminals "is to save harmless the port against any and all liability which may be due to its operation hereunder." And further, "the privilege hereby granted to the company may not be assigned by it, nor underlet without the written consent of the port having been first obtained." The contract further contains certain restrictions concerning the display of advertising signs; and further provides that the Salmon Terminals in its operations will comply with all valid regulations of law and charter provisions of the city ordinances of the city of Seattle.

The parties are in dispute as to the interpretation or construction to be placed on the contract. Appellants contend the contract is a mere license or permission; whereas the respondent maintains it is a lease. If the contract be construed to be a lease, then it is void under Rem. Comp. Stat., § 9692, which, so far as applicable here, provides: That a port district has the power

". . . to fix absolutely and without right of appeal or review the rates of wharfage, dockage, warehousing and port and terminal charges upon all improvements owned and operated *directly* by the port district itself and ferry charges of ferries operated by itself: *Provided, however,* That the port commission shall file with the public service commission of the state of Washington its schedule of rates and charges so fixed, as is required by the laws of the state of Washington of public service corporations, and may not change any rate or charge so filed without first

filing a notice of such change of rate or charge with the public service commission not less than thirty days prior to the going into effect of such change of rate or charge, . . ."

Section 9692, *supra,* further provides: That a port district has the power

". . . to fix, *subject to state regulation,* rates of wharfage, dockage, warehousing, and all necessary port and terminal charges upon all docks, wharves, warehouses, quays, or piers owned by said port district *but operated under lease* from it; to execute *leases* of all lands, wharves, docks and property owned and controlled by said port district upon such terms as the port commission may deem proper: *Provided,* That no lease shall be executed for a period longer than thirty (30) years, and *every such lease shall be secured by a bond,* with surety satisfactory to the port commission, in a penalty not less than the rental of one-sixth of the term, but in no case less than the rental for one year where the term is one year or more, conditioned to carry out and perform the terms and conditions of such lease: . . ."

Thus it will be seen that the port has two powers conferred on it by statute: First, it may operate directly its properties at rates fixed by it; or, second, it may lease its properties, which lease, however, must be secured by bond, and the rates fixed shall be subject to state regulation.

Is the agreement entered into between the parties a lease?

It is elementary that no particular words, technical or otherwise or forms of expression are necessary to constitute a lease, and the existence of the relationship of landlord and tenant is primarily a fact question to be determined from the intent of the parties ascertained from a consideration of the entire instrument creating the tenancy. Underhill on Landlord and Tenant, p. 242. If exclusive possession or control of

the premises, or a portion thereof, is granted, even though the use is restricted by reservations, the instrument will be considered to be a lease and not a license. Nor is the reservation of rent an essential requirement. *Stubblefield v. Jones,* 230 S. W. (Tex. Civ. App.) 720; *Philadelphia Trust Co. v. Johnson,* 257 S. W. (Tex. Civ. App.) 280.

"A lease is a contract for the *exclusive* possession of lands or tenements for some certain number of years or other determinate period, and a contract for such exclusive possession is a lease although there may be certain reservations or a restriction of the purpose for which the possession may be used, and although it may be described as a license." Woodfall's Law of Landlord and Tenant (20th ed.), p. 153.

"A tenant, as we have before seen, has the possession and the right of possession, which he may assert against the whole world and which, except in the case of a tenant at will, he may transfer to another, and is not terminable at the landlord's option. . . . One having a license on the other hand, has merely a permission to do certain acts, which he can assert against the licensor only, and which is ordinarily terminable or revocable at the will of the latter, and is not transferable." Tiffany, Landlord and Tenant, Vol. 1, p. 23.

A few cases from this and other courts will illustrate the distinction between a lease and a license. In the case of *Gottlieb v. Culbertson's,* 152 Wash. 205, 277 Pac. 447, it was held that where space in a general store was rented for the sale of furs, with light, heat, and janitor service furnished by the store, and fifteen per cent of the gross sales of furs charged for the space, the relation of the parties was that of landlord and tenant.

In *Meers v. Munsch-Protzmann Co.,* 217 App. Div. 541, 217 N. Y. Supp. 256, an agreement "permitting" plaintiff to occupy certain space in defendants' drug store with a soda fountain for five years, with the priv-

ilege of buying goods from the defendant at ten per cent above wholesale, and the defendant to receive a percentage of the plaintiff's gross income, was held to be a lease, and not a mere license.

"It is our view that the agreement, . . . was one 'for the occupation of real estate in the city of New York.' It is manifest that it was intended by the agreement to confer upon the plaintiffs something more than a bare license. A license in respect to real property may be defined to be an authority to do a particular act or series of acts upon another's land, which would amount to a trespass without such permission." *Meers v. Munsch-Protzmann Co.*, 217 App. Div. 541, 217 N. Y. Supp. 256.

In *Williams v. Hylan,* 126 Misc. Rep. 807, 215 N. Y. Supp. 101, an instrument authorizing the maintenance of refreshment stands in a public park for ten years at an annual rental, although characterized as a "license," was held to be a "lease," though terminable on six months' notice, and authorizing the park commissioners to prescribe regulations.

"The term which is applied to the document by the parties themselves does not necessarily determine the nature of the grant. The observation of the Court of Appeals in *Greenwood L. P. J. R. Co. v. New York & G. L. R. Co.,* 31 N. E. 874, 875, 134 N. Y. 435, 439, is directly in point:

" 'While the instrument creating the right is termed in the body thereof, a "license to use said railroad" this is not conclusive, for the court must look at the nature of the right, rather than to the name that the parties gave it, in order to learn its true character.'

"If the instrument purports to yield up exclusive possession of premises against the world, including the owner, it is not a license, but creates an irrevocable estate or interest in the land. *Berwyn v. Berglund,* 99 N. E. 705, 255 Ill. 498. Such exclusive possession is certainly given to the licensee, so called by this agreement. It is perfectly true that it contains a cancellation clause, but so do many leases in commercial and

other realty situations. This clause is, in fact, even narrower than the usual proviso, in assuring to the city the right to annul upon six months' notice, and only upon the contingency that the property is required for 'any public purpose.' In *Mehlman v. Atlantic Amusement Co.*, 119 N. Y. S. 222, 65 Misc. Rep. 25, the defendant let to the plaintiff the right to maintain at Steeplechase Park, Coney Island, three stands for the sale of candies, one of which was to be located in the main pavilion of the park, and also the storeroom under the steeplechase tracks. The period of the grant was for the summer season of the year 1907. In construing the contract, the court said:

" 'While it is true that the mere use of the words "lease" and "let" in the contract does not necessarily create a lease, as distinguished from a license, nevertheless, the instrument in suit must be regarded as a lease, since it gave plaintiff a right to the possession and use not only of a certain specified space of ground for his stands, but also of the storeroom under the tracks, which right of use and possession certainly affected defendant's right to the exclusive use of its land.'

"The right of the grantee here is none the less exclusive, because it gives the commission the power to prescribe regulations for the use of the property."

In *Denecke v. Miller & Son*, 142 Iowa 486, 119 N. W. 380, a well-considered case, Miller & Son gave "permission" to one Terry to put a stock of electrical supplies in a part of the storeroom occupied by them as a plumbing business. In the agreement it was expressly recited that the permission was "a privilege or license only." Miller & Son reserved the right to designate from time to time the place on the premises to be occupied by Terry. Notwithstanding the recitals, the court held the instrument was a lease, and not a mere license or privilege.

In the present case, Salmon Terminals was given the *exclusive* right to the use and possession of 334,400 square feet of the warehouse space on pier 40, and was

given the *exclusive* right to store its canned salmon. It was given the preferential right to the use of the berthing space. The contract provides that the Salmon Terminals should repair the equipment, and that it should bear and pay all operating expenses. It further provides that the port shall receive, as compensation for the use of its premises, the established tariff on certain goods, and on others seventy-five per cent of the tariff rates, and, in addition thereto, The Salmon Terminals bound itself to pay as *rental* for office space at the rate of five cents per square foot; the agreement to be effective for a period of five years, with the option for an extension of an additional term of five years. It recites that the "privilege" granted may not be assigned or underlet without the written consent of the port having been first obtained. Despite the designation of the instrument as a preferential agreement or as a "privilege", and the restrictions and reservations contained therein, we hold, from a consideration of the entire instrument, that it is a lease, and not a license or a mere privilege. And, inasmuch as no bond had been taken from the Salmon Terminals, the agreement or lease was made in violation of the provisions of the statute defining and limiting the powers of the Port Commissioners, and hence was void.

Appellants next contend respondent is not entitled to the relief sought, because, the port being a municipal corporation, its acts, even though unauthorized, irregular, or illegal, cannot be restrained at the instance of an individual taxpayer, because there is no showing that the illegal act complained of will result in either special damage to the respondent, or general damage to the taxpaying public. In support of this position appellants rely on the case of *Maxwell v. Smith,* 87 Wash. 629, 152 Pac. 530.

The *Maxwell* case, *supra,* is distinguishable from the instant case in two important particulars: First, in the instant case the contract between the Salmon Terminals and the port is *illegal,* no bond having been obtained from the Terminal Company, whereas, in the *Maxwell* case, *supra,* the contract between the city of Spokane and Stevens was held to be *legal;* and second, in the *Maxwell* case, *supra,* it was shown that the contract, instead of resulting in damage to the taxpaying public, "resulted in a *benefit* to the taxpayers" and hence there was no necessity for injunctive relief. Here, general damage to the taxpayers is shown. The port having failed to take a bond from the Salmon Terminals, the *risk* of loss resulting from noncompliance or breach of the contract would fall upon the taxpaying public. The assumption of this risk constitutes a general damage.

Courts generally hold that, if the *illegal acts* of a municipal corporation are such as to increase taxes or *violate public rights,* any taxpayer may bring suit for injunction, and it is not necessary for him to show special pecuniary damage to himself, general damage to the taxpaying public being held sufficient. See Dillon on Municipal Corporations (5th ed.), Vol. 4, §§ 1579 to 1587, inclusive. The supreme court of the United States lays down the same rule:

"Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property-holders of the county may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the state courts in numerous cases; and from the nature of the powers exercised by municipal corporations, the great danger of their abuse and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the ap-

plication of the taxpayers of a county to prevent the consummation of a wrong, when the officers of the corporations assume, in excess of their powers, to create burdens upon property holders. Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained . . ." *Crampton v. Zabriskie,* 101 U. S. 601.

In *Dirks v. Collin,* 37 Wash. 620, 79 Pac. 1112, we said:

"Injury to the taxpayers is conclusively presumed from the unlawful expenditure of public money."

Where a city council proceeds illegally in matters of a contract, it will be presumed that such disregard of the law is injurious to a taxpayer and he need not show actual pecuniary damage.

"Besides, as a taxpayer, plaintiff was beneficially interested; and I do not think it essential upon an application in a proper case, designed to compel compliance with statute law, that the party must show actual pecuniary damage. It should be presumed that where the law enjoins a duty upon a municipal body, and specifically points out the mode of its performance, a violation of that duty, and a disregard of the mode of its performance, will work injury." *Santa Rosa Lighting Co. v. Woodward,* 119 Cal. 30, 50 Pac. 1025.

If a municipal corporation undertakes to enter into an illegal or ultra vires contract, and ignores the statutory safeguards which the legislature has created for the protection of the taxpayers, it is a fair presumption that every taxpayer will be injured in some degree by such illegal act.

"In a suit of this kind the court will not stop to inquire respecting plaintiff's standing further than to determine whether he is a taxpayer. That gives him sufficient interest in preventing the misuse of public

money to entitle him to be heard in that regard even though it be true that the personal loss to him, in the event of no remedy being applied, would be infinitesimal." *Chippewa Bridge Co. v. City of Durand,* 122 Wis. 85, 99 N. W. 603.

When the act complained of is a violation of a public right, it is not necessary for the plaintiff to show any personal pecuniary damage. This is recognized in the case of *Bancroft v. Building Commissioner of City of Boston,* 257 Mass. 82, 153 N. E. 319.

"The general rule is that, to maintain a petition for mandamus, the petitioner must show some private right or interest beyond the right and interest of the public. But when the question is one of public right and the purpose is to procure the performance of a public duty, and no other remedy is open, a petitioner need not show that he has any special interest in the result: it is sufficient that as a citizen he is interested in the due execution of the laws. *Union Pacific R. v. Hall,* 91 U. S. 242."

In *Krieschel v. Board of Commissioners of Snohomish County,* 12 Wash. 428, 41 Pac. 186, we held that a taxpayer could maintain an action to enjoin the county commissioners from removing the county seat, and thereby prevent the illegal expenditure of public money. To the same effect, see *Rickey v. Williams,* 8 Wash. 479, 36 Pac. 480. We have recognized the right of a taxpayer to maintain a suit where special funds were involved, although there was no direct loss to such taxpayer. *Hill v. Seattle,* 108 Wash. 572, 185 Pac. 631; *Cuddy v. Sturtevant,* 111 Wash. 304, 190 Pac. 909; *Aylmore v. Seattle,* 48 Wash. 42, 92 Pac. 932, L. R. A. 1918E 127; *Scott v. Tacoma,* 81 Wash. 178, 142 Pac. 467; *Twitchell v. Seattle,* 106 Wash. 32, 53, 179 Pac. 127; *Jones v. Centralia,* 157 Wash. 194, 289 Pac. 3; 157 Wash. 227, 289 Pac. 14.

Finally appellants contend that the case of *Raine*

*v.· Port of Seattle,* 118 Wash. 168, 203 Pac. 61, is determinative of the question in the case at bar that a bond from the Salmon Terminals was unnecessary. With this we cannot agree. In the *Raine* case, *supra,* the port of Seattle leased a portion of its ferry system, theretofore operated at a loss, to King county, without taking a bond from the county. We upheld the lease, although no bond had been given, on· the ground that both the port and the county were public bodies. Here the Salmon Terminals is not a public body, and it could acquire the right to use and take possession of the port properties only by lease secured by bond as required by statute. Furthermore, in the *Raine* case, *supra,* there was no agreement on the part of the county to pay rent, nor were the rates of either the port or the county subject to state regulation; whereas, the Salmon Terminals not being a public body, its rates are clearly subject to state regulation.

Judgment affirmed.

TOLMAN, C. J., BEALS, FULLERTON, and MILLARD, JJ., concur.