**FEMMER v. CITY OF JUNEAU et al.**
No. 8639.

Circuit Court of Appeals, Ninth Circuit.
June 16, 1938.

**650**

James Wickersham and Henry Roden, both of Juneau, Alaska, for appellant.

Faulkner & Banfield and H. L. Faulkner, all of Juneau, Alaska, for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This appeal is from a decree dismissing the amended bill of complaint in a suit brought by appellant against appellees to have a contract between appellees Northland Transportation Company and the City of Juneau declared invalid and to have the appellee officers of the City enjoined from doing anything under or in aid of the contract. The original bill was filed May 8, 1935. The amended bill was filed April 25, 1936, pursuant to leave of court granted on that date.

At the trial the following facts were brought out: The City of Juneau is a municipal corporation situate in and organized under the laws of the Territory of Alaska. It is located on the sea coast. Appellant was and now is a resident within the City of Juneau, an owner of both real and personal property therein, and was at all such times and now is a taxpayer in said City of Juneau. At all times the plaintiff, as such property owner, was duly assessed and paid taxes on his property in Juneau, for school, municipal and general taxation purposes.

When this action was begun the City owned and for more than twenty years had operated a public wharf or dock but it had been out of use for almost a year. It is undisputed that at the time the contract was executed the wharf had fallen into such a degree of disrepair that no ship could use it as a landing dock. The warehouse had commenced to rot away and could only be saved by covering it with corrugated iron. Piling had rotted away, and if replacement had not been promptly made the face of the wharf would have fallen into the bay.

The testimony was undisputed that at the time of making the contract the wharf, even in good repair, could not have been used or operated without loss unless one of the regular ship lines could be induced to adopt it for its regular landings.

Pursuant to resolution of its Council and by the signature of I. Goldstein, as Mayor, the City of Juneau and, by its proper officers, the Northland Transportation Company executed the contract in suit on April 24, 1935, effective two days thereafter.

The substance of the contract is as follows: Northland is granted for a period of five years the privilege of landing all its vessels, arriving at the port of Juneau, at the City wharf, and to there discharge and take on freight, baggage, mail and passengers. Northland is given a priority in the right to so land its vessels and thus use the dock, provided that a reasonable notice be given the City not less than six hours prior to the arrival of each of Northland's vessels. The City reserves the right to dock and serve other vessels than those of Northland subject only to the prior right just stated.

The City agrees to place the premises in a proper condition to be used by making certain described repairs, and to keep the premises in a reasonably safe and convenient condition, but Northland is to replace or repair broken parts of the wharf when damaged through its negligence.

The City is to furnish a wharfinger and is to handle the freight to and from the ships of the Northland vessels and provide warehousing therefor while in transit.

Northland agrees to pay the regular and current rates for such water as may be furnished it; to pay the outbound wharfage and advance charges, which are to be in accordance with the current tariff; and to pay a "call charge", fixed at Ten Dollars ($10.00) per voyage on each vessel calling at the wharf or a total of Fifteen Dollars ($15.00) where the vessel making a round trip voyage docks at Juneau upon both the going and returning trip.

Northland agrees that a minimum of 6000 tons of freight shall be moved across the wharf during each twelve month period of the life of the contract. In case the actual tonnage shall be less than 6000 tons, Northland will pay the current wharfage rate per ton on the difference between the actual tonnage so moved and the total of 6000 tons. ・ The City may cancel the agreement after the expiration of eighteen months from its effective date if for any twelve month period the tonnage moved across the dock falls below 7000 tons.

The City may at any time sell the wharf property subject to the contract or may, on 90 days notice, cancel the agreement in case of a sale to a purchaser who desires to use the property for some other purpose than that of a public wharf.

The parties agree that in the case any dispute arises as to the terms of the contract or the fulfillment thereof it shall be settled by arbitration. The City agrees to defend, at its own cost, any suit or action brought by third parties attacking the validity of the contract. Northland is given an option to renew the contract, at its expiration, for a further period of five years. The City agrees, during the life of the contract, to ship by Northland's vessels, not less than ninety per cent of all freight consigned to the City, provided the charges for such service are not greater than those charged by competing lines.

There are various other provisions contained in the agreement, but the provisions mentioned suffice to illustrate the scope of the contract. Other clauses therein have no bearing on the questions presented to us.

In conditioning the wharf the City spent approximately $5000 from its general tax fund. The operation of the wharf under the contract up to Jan. 1, 1937, netted the City over and above all conditioning and operating expenditures, together with a proper allowance for depreciation, the sum of $869.84. Receipts from wharf operations were deposited in the general fund.

There was some speculative testimony that the use of the wharf by the Northland Company's boats *might* cause inconvenience to users of the separate City Float, but no actual interference was proved. The uncontradicted evidence is that no boat ever had to leave the wharf because of its use by the Northland vessels under the contract, and that there had never been any interference by the Northland's vessels with the use of the wharf by other parties. During the period that the agreement has been in effect many other vessels have docked at the wharf. The schedule of rates and charges for the use of the wharf were kept both in the wharfinger's office on the wharf and in the City Clerk's office at the City Hall, and were available to all users.

Appellant Femmer testified that his taxes had not been increased by the operation of the contract. He testified that he is the owner of a "public dock taking in various boats" and feared that he might be damaged in a roundabout way.

The trial court filed a written opinion and thereafter findings of fact and conclusions of law and decree were entered as of July 17, 1937.

The numerous arguments advanced by appellant in his attack upon the validity of the City of Juneau-Northland contract raise three fundamental questions. First, did the municipality have power to enter into the

contract, or do the provisions of the contract transcend the scope of the City's powers? Second, if the contract is within the scope of the City's powers, was it entered into by the proper agency of the municipality? Third, if within the scope of the City's corporate powers and entered into by the proper agency, was the contract entered into by the method provided by statute?

We believe that the City of Juneau had power to enter into the contract. At the time of its execution the City had express legislative authority to "purchase, construct, or otherwise acquire, establish, and operate public wharves." Sec. 2383(4), Comp.Laws of Alaska, 1933, as amended by Chap. 48, Session Laws of Alaska, 1935.[1] Incident to a power thus expressly granted is the power to make such contracts as are necessary to its effective exercise. As said by a leading authority on municipal corporations:

"Ordinarily the local corporation is permitted to enter into all contracts which are proper and necessary to enable it to perform the functions expressly conferred and those which are necessarily implied from the powers conferred * * *. The power to make contracts may result (a) from the inherent power of a municipality to perform indispensable acts, (b) from express words in a statute or the charter, or (c) from what is implied as an incident to the powers expressly conferred on the municipality by a statute or the charter.

"* * * in order to exercise these [express] powers the municipality of course must make appropriate contracts; and it may be stated as a general rule that where there is no charter or statutory restriction a municipality may make any contract necessary to enable it to carry out the particular powers expressly conferred. 'A corporation authorized to do an act has, in respect to it, the power to make all contracts that natural persons could make.' * * * *"[2]

The wharf had been owned by the City for many years but for nearly a year prior to the execution of the challenged contract it was not used. The regular transportation lines offered the only source of income from operation of the wharf sufficient to meet operating expenses. It is well to here state that the City is prohibited from operating a public utility save from revenue collected from the users thereof. Sec. 2383(4) Comp.Laws of Alaska, 1933, as amended by Chap. 48, Session Laws of Alaska, 1935. The wharf "had commenced to rot away" and to place it "in a proper condition to be used" required extensive repairs whose cost amounted to more than $5000.

In such circumstances it cannot be said by this court that the contract, the substance of which is that the City, in return for a guarantee of a steady and substantial patronage, obligates itself to make certain repairs to the wharf and to give Northland a conditional priority in the right to land its vessels at and use the wharf, is not one reasonably necessary to enable it to exercise its powers to "establish and operate" a public wharf. As said in State ex rel. Ellis v. Tampa Water Works Co., 1908, 56 Fla. 858, 47 So. 358, 360, 19 L.R.A.,N.S., 183:

"Unless expressly or impliedly restrained by statute, a municipal corporation has a discretion in the choice of means and methods for exercising the powers given to it for governmental or public purposes, and the usual limitations upon the actions of municipalities within their legal powers are good faith and reasonableness, not wisdom or perfection."

Of course we are not implying that in the exercise of a power to establish and operate a public wharf, a municipality would be warranted in divesting itself of control or in granting away an exclusive user thereof. A contract having such a result would be illegal and void. Juneau Ferry & Navigation Co. v. Morgan, 9 Cir., 1916, 236 F. 204; see Note, 63 A.L.R. 623. The provisions of the contract clearly show that the City has not divested itself of control of public property nor has it granted a monopoly in its use. On the contrary, the City expressly agrees to "maintain" the wharf, to furnish "heat, light and water" thereon, to furnish a wharfinger "for the performance of all services usually required of a wharfinger in the operation of a public wharf."

The contract gives Northland no unlawful preference, and there is no claim made that other users are being discriminated against. At the trial both the City Wharfinger and the Mayor of Juneau testified that no inconvenience had resulted to any

---

[1] See, also, subsection 3. of Sec. 2383, Comp.Laws of Alaska, 1933.

[2] McQuillin, Municipal Corporations (2d ed., 1928), Vol. III, § 1269, pps. 806, 807.

other vessel by reason of Northland Company's limited contractual right of priority. Appellant gave vague testimony to the effect that the use of the wharf by the Northland Company's vessels might inconvenience users of the City Float. But if such is the result of the use of the wharf by the Northland's vessels, it does not appear that such result is in any way traceable to the fact that Northland has a prior right to use the wharf. Of interest in this connection are two recent Massachusetts cases decided within a day of each other.

In Cape Cod S. S. Co. v. Selectmen of Provincetown, Mass., 1936, 3 N.E.2d 244, a town granted to a steamship company "the exclusive right and privilege" of occupying a portion of the town pier for the purpose of docking and otherwise carrying on its transport business. The lease contained a clause that "the lessee shall have the exclusive rights to occupy the demised premises and no boat or boats carrying passengers for hire shall be permitted to use any part of said Town Pier without the written permission of the lessee." The court pointed out that the lease would not only exclude the petitioner steamship company from "Town Wharf", but would also prevent it altogether from docking its steamships at Provincetown, unless it incurred the expense of preparing another suitable wharf. The lease was held invalid, the court stating:

"* * * The town could no more grant the exclusive use of any part of it [the wharf] needed by the public for the purposes of a landing to particular persons or corporations in derogation of the equal rights of the rest of the public than it could grant to individuals the exclusive right to travel over portions of its town ways." Page 245.

In D. N. Kelley & Son v. Selectmen of Town of Fairhaven, Mass., 1936, 3 N.E.2d 241, the action was brought to obtain the cancellation of leases to a boat building company of parts of wharf property owned by the town and to restrain the leasing of another portion of the wharf. It was found as a fact that (page 242):

"* * * During the terms of the present selectmen no demand or request has been made to them or brought to their attention for use or space, other than what is used, and no one has been refused or denied use of the wharf or space thereon. No demand or request has been made to the wharfinger since taking office * * *

for more space, and no one has been denied the use of the wharf."

The court held the leases to be valid, stating:

"* * * It is manifest that the leases here assailed have not interfered with the use of the wharf by any of the public or for any public purpose. No one has been excluded from landing on, embarking from, or mooring at the wharf, or been deprived of any use of it. This conclusion does not impair in any degree the settled principle that public money or public property cannot rightly be given over to private purposes. [Citing cases.]" Page 243.

We think that in the present case, there being no grant of an exclusive right of user, and no showing that the public generally has been deprived of any use of the wharf, we must, as did the court in the Fairhaven Case, supra, sustain the validity of the contract as against the attack under consideration.

 Also attacked as being outside the contractual power of the City is the provision for arbitration of disputes arising "between the parties regarding the terms of the contract or the fulfillment of the same." Having a right to contract incident to the power to operate a public wharf the City had power to provide for arbitration of contracts thus entered into. McQuillin, Municipal Corporations (2d ed.1928) § 1269, p. 810. Likewise we see no impropriety in the agreement of the City to defend at its own expense, any suit brought for the purpose of attacking the validity of the agreement. This provision is very reasonable as an insurance against cancellation of the contract through default of the City to defend it.

██ It is also claimed that the contract is invalid because it fixes charges for the use of the wharf. The only charge established in the contract is a "call charge" *to be paid by Northland* on all of its vessels calling at the wharf. This "call charge" must not be confused with wharfage rates. There is no testimony that other vessels are assessed a higher charge for their "calls". In fact for all that appears in the record the charge may be a special one applying to Northland alone, agreed to as part consideration for the entry of the City into the contract. However this may be, we see no objection to the contractual establishment of this charge, at least so long as other users are not discriminated against and no question

654

of reasonableness is raised. The power of the City to fix rates and charges for the use of municipally owned services is necessarily to be implied from the direction in subsection fourth of section 2383, as amended by Chap. 48, Session Laws of Alaska, 1935, to operate and maintain such public utilities, by "revenue collected for service rendered by such plants or utilities from the customers or users thereof." We have already seen that the power to make the Northland contract attached as an incident to the specific power to operate public wharves granted by this subsection. Having the power to grant to Northland a right of user of the wharf and having the power to fix charges for such user the City ipso facto had the power to stipulate that during the duration of the contract the charge would remain constant. Without such power the City could not have obtained a guaranty of a steady and sustaining patronage.

■ In connection with his argument on this point appellant has cited subsection tenth of section 2383 and section 2402, Comp.Laws of Alaska, 1933. Those statutes are not here applicable. This is not a case where the City has attempted to contract away its power to fix and from time to time change the rates to be charged by *private organizations* engaged in furnishing public services. Such action is prohibited by the cited sections. But the sections have no effect upon the power of the City to contractually fix the rate to be charged a user of a *municipally owned* public utility.

Another argument advanced by appellant is not readily classifiable because of its inherent fallaciousness. Because of its general tenor, it is here treated as one of the arguments raising the question of whether or not the municipality had power to enter into the contract. It is pointed out that subsection fourth of section 2383 as amended by Chap. 48 of the Session Laws of Alaska, 1935, provides that,

"* * * such public utilities as are provided for in this sub-section shall not be operated or maintained by funds raised by taxation but from the revenue collected for service rendered by such plants or utilities from the customers or users thereof."

It is claimed that since the evidence indisputably shows that "funds raised by taxation" were used to make the repairs called for by the contract, it follows that the *making of the contract was beyond the power of the municipality* and that consequently the City should be restrained from performing any and all of its obligations thereunder.

■ This argument is without substance. The contract itself does not bind the City to the use of the tax fund or of any other particular fund in the performance of its contractual obligation to put the premises in an usable condition. Assuming arguendo that the City in carrying out its contractual obligation violated the quoted provision of section 2383, we fail to see how this unilateral act could be held to result in the voiding of the contract. We are aware of no rule of law to the effect that a contract legal in object becomes void because a party thereto does an independent wrongful act in the course of fulfilling obligations thereunder. The situation would be different were appellant by this action seeking to restrain the City from the unlawful expenditure of funds in the performance of its contractual obligation. Equity, in a proper case, could grant such relief. Bates v. Mayor and Council of Nome, 1901, 1 Alaska 208, 212. But in the present case it is not sought to prevent the performance of an illegal act—the act claimed to be illegal had already been performed when the amended complaint was filed. The contention here is that contractual performance, proper in itself, should be restrained because the previous performance of an independent and proper contractual obligation was accomplished through the use of funds not legally available for that purpose. The contract not being void as calling for an illegal act its performance cannot be restrained, and the claimed illegal expenditure in the performance of one of its terms already having been accomplished, it is now too late to seek to restrain the City or its officers from using the funds. As said in Northwestern Light & Power Co. v. Town of Milford, 8 Cir., 1936, 82 F.2d 45, 47, "This court will not direct the issuance of an injunction to prohibit the doing of things which have already been done." It not appearing from the evidence that there exists any likelihood that the City will, in the future, draw on its general fund for expenditures in connection with the wharf we need not concern ourselves with a problem that has not been shown to exist.

We do not wish to be understood as inferring that the expenditure of funds to place the wharf "in a proper condition to be used" was illegal as in violation of the quoted proviso of section 2383. We do not

here decide that question, but it may be said that in view of the undisputed testimony to the effect that at the time the outlay was made the dock "had commenced to rot away" and could only be saved by making the repairs contracted to be made, there is room for strong argument to the effect that the expenses were in reality capital expenditures necessary in order to "establish" a wharf, rather than being expenses of "operation or maintainance," which last alone are required by section 2383 to be paid "from the revenue collected for service rendered."

Having determined that none of the challenged provisions of the contract are illegal as being outside of the contractual power of the municipality, we next consider the claim that the contract is invalid since not entered into by the proper agency of the municipality.

Appellant's contention on this point is based upon the amendment made to section 2381 of the Comp.Laws of Alaska, 1933, as amended by Chap. 48, Session Laws of Alaska, 1935, effective March 12, 1935. Prior to the amendment, section 2381 (which is captioned, "Council Appoints City Officers") provided only that the Council "shall have power" to appoint certain municipal officers. The amendment limited the term for which such appointments could be made and added to the section a proviso as follows:

"Provided, however, that council of cities which own and/or operate public utilities may provide by ordinance for a Board of five members in which the management of such public utilities shall be vested, and to define its powers and duties. The Board shall be elected at the next general or special municipal election at which election one member shall be elected to serve for a term of one year, one to serve for a term of two years, one to serve for a term of three years * * *."

The argument is that by the enactment of the quoted portion of the amendment the Council of the City of Juneau was divested of the power to manage public utilities; that it was thereby made mandatory upon said council to create a public utility board in which such power was to be vested; that the contract made by the Council relating to the operation of the wharf, since made by the Council subsequent to the effective date of the amendatory statute, was executed without authority in law and so is void.

We think that the amendment made by Chap. 48, Session Laws of Alaska, 1935, did not take away from the Council its power to operate public utilities, but only provided an alternative method for their management. There can be no doubt that prior to the enactment of the amendment the City Council and the City Council alone had power to maintain public utilities (including wharves). Section 2383, subsections 3 and 4, Comp.Laws of Alaska, 1933. Had the legislature intended to deprive the Council of the right to manage it seems evident that by the amendatory act above referred to it would have repealed the sections giving to the Council such power. But rather than so doing, the legislature in the same Act which amended section 2381 by adding the proviso dealing with a Board of Public Utilities, also amended subsection fourth of section 2383 to *elaborate upon the power granted to the Council in that subsection* to "purchase, construct, or otherwise acquire, establish, and operate" public utilities. Also, it seems reasonable to suppose, that had the legislature intended to do more than *permit* the Council to delegate its authority over public utilities to a Board which it could provide for by ordinance if it saw fit to do so, it would have indicated, in amending subsection fourth of section 2383, that the power therein granted was to be exercised by a Board rather than by the Council.

Moreover, if it was the legislative intent to provide that in every case the management of public utilities should be taken out of the hands of the Council and put into the hands of a public utilities board, no reason appears why it was enacted that the City Council "may provide by ordinance for a Board." It was within the power of the legislature to declare outright that the management of public utilities was thereby vested in a Board and to itself "define its powers and duties." There was no necessity for providing for intervention of the City Council if what was desired was the unconditional transfer of public utility control from councils to boards. Purpose in the sentence providing for enactment of an ordinance by the City Council exists *only* if the legislature intended to allow for the transfer of control as and when the Council saw fit to make such a change.

Appellant asserts that the word "may" as used in the phrase "may pro-

vide by ordinance" is to be construed as "mandatory" rather than "permissive", while appellee argues that the legislature would have used "must" or "shall" had it intended a mandate. In the present case we do not think judicial definitions of these words helpful. In every case of statutory interpretation the aim is to discover the legislative intent. We think that in the present case the factors above discussed unmistakably show that the intent of the legislature was to give the Council the power to create a board if in its discretion it saw fit to do so.

For the foregoing reasons, we think the Council had authority to enter into contracts relating to public utilities at the time that the contract sought to be declared void was executed.

Having decided that the Northland contract was within the scope of the municipal powers and that it was entered into by the proper agency of the municipality, we must now determine whether it was entered into in the mode provided by statute. Appellant asserts that the contract is invalid because it was not submitted to the electorate and approved by them as required by law. Such procedure is claimed to be necessary by reason of the requirement of subsection sixteenth of section 2383, Comp.Laws of Alaska, 1933, or, in the alternative, because of the similar requirement of subsection twentieth of the same section.

Subsection sixteenth gives the City Council power

"To grant franchises for the construction and maintenance of electric light and power plants, water plants, telephone and other public service, and to permit the use of streets and other public places for a period of not to exceed twenty years, under such rules and regulations as may be prescribed by ordinance. Provided, however, no such franchise shall be valid until it has been submitted to the electors of the municipality and at least fifty-five per centum of the votes cast at any municipal election or any election held for such purpose shall be in favor of such franchise. * * * And every ordinance granting such franchise shall therein provide for the submitting of the ratification thereof to the qualified electors of the city * * *."

Subsection twentieth gives the Council power

"To acquire by purchase or otherwise, and to hold real estate or other property, or any interest therein, and to sell, lease or otherwise dispose of such real estate and other property, or interest therein * * * including property acquired or held for any public use or devoted thereto, when in the judgment of the city council the same shall be no longer required for municipal purposes; * * * provided, that in the sale or other disposition of property now held or hereafter acquired by any city, the city council shall by ordinance fix and prescribe the terms of said lease or other disposition of said property, * * * and provided further, that no ordinance for the sale, lease, exchange or other disposition of any property acquired or held for public use or devoted thereto, shall be valid unless ratified by a majority of the qualified voters voting at a special or other election at which the question of the ratification of such ordinance is submitted. * * *"

It thus appears that both in the case of the grant of a franchise to *construct* and *maintain* public utilities and in the case of a sale, lease, exchange or similar disposal of public property approval of the electorate is necessary to validate the transaction. However, distinguished from such transactions by separate statutory mention is the power of the Council to grant permission to use "streets and other public places for a period of not to exceed twenty years." Section 2383 requires no public approval of the exercise of this power by the council. Subsection sixteenth thereof, after drawing a distinction between franchises and permits to use, requires only that "franchises" shall be submitted to public approval.

Since the Northland contract was not submitted to the electorate for its approval it becomes necessary to determine the nature of the right granted by that agreement. While the grant of a right to use a public wharf, being a privilege conferred by public authority, may be a "franchise" within the broad and general meaning of that word we do not think that it is a "franchise" within the meaning of subsection sixteenth of section 2383. As there used, the word is limited to include only privileges granted to a private person to *construct and maintain public services*. The Northland contract grants no such right. As pointed out earlier, control

in the operation and management of the wharf is retained by the City.

Nor do we think that the Northland agreement effected a "sale, lease, exchange or other disposition of property" within the meaning of subsection twentieth of section 2383. Of course, no serious contention could be made that the result of the transaction was a sale or exchange of the wharf or part thereof. However, it is argued that the agreement amounted to a lease. With this contention we do not agree. Northland was not given a right to possession of the wharf or any part thereof but merely a permission to use it for a limited purpose—a purpose entirely consistent with its intended use. Bouvier's Law Dictionary, Rawle's Third Rev., defines a lease as

"A species of contract for the *possession* and profits of lands and tenements either for life or for a certain period of time, or during the pleasure of the parties." (Italics added.)

And Tiffany says in his work on real property

"That one who is a tenant under a lease has the possession of the land serves to distinguish him from a licensee, that is, a person to whom is given merely permission to use the land for a specified purpose. Such a person has not the possession of the land, this remaining in the licensor, and he has not it seems, any interest in the land which he can assert as against a third person, that is, he has no rights in rem."[3]

All that Northland acquired by the contract under consideration was a privilege to dock its vessels at, and of using the wharf for all purposes pertinent to its transportation business. The facts of this case do not bring it within such cases as Barnett v. Lincoln, 1931, 162 Wash. 613, 299 P. 392; Mayor and City Council of Baltimore v. Baltimore Steam Packet Co., 1933, 164 Md. 284, 164 A. 878. The mere fact that Northland was granted a preference in its limited right to use does not make the interest one in rem. See, Old Dominion S. S. Co. v. City of New York, D.C.N.Y.,1921, 286 F. 155, 157, affirmed 2 Cir., 286 F. 157. We think that Northland is a mere licensee under the challenged contract.

It is asserted that if all that was granted was a privilege to use a public place, that under subsection sixteenth of section 2383, such permission should have been granted by ordinance. We do not so construe the statute. It requires only that permission to use may be given under [that is, in accordance with] "Rules and Regulations" established by ordinance, not that each separate permit must be the subject of an ordinance. There is no evidence in this case that general regulations governing the issuance of permits to use the wharf have not been enacted, or that the rights given under the Northland contract in any way conflict with such rules as may have been enacted. There is no merit in appellant's contention.

A similar argument is to the effect that the rates and charges for the use of the wharf have not been given reasonable publicity. Assuming reasonable notice of such charges to be necessary, it suffices here to say that the trial court found as a fact, and we think correctly, that such rates and charges had been promulgated and established by the City, and were kept accessible in two public places. However, this subject has no materiality here, as the detail of fixing a legal rate has no relation to the legality of the contract.

Appellant makes an assertion that the contract was not made the subject of an ordinance, but was passed by resolution and secretly. There is no evidence in the case tending to show secret action on the part of the Council. Section 2391, Comp. Laws of Alaska, 1933, gives the Council power to exercise its powers by ordinance *or by resolution.* Despite this section, exercise of powers by ordinance is probably necessary in some cases, e. g., subsection fifteenth of section 2383, Comp.Laws of Alaska, 1933, giving the Council power "by ordinance" to establish wood, coal, etc., yards. But we think that authority to the appropriate officers to enter into a contract may properly be given by resolution.

We conclude that the challenged provisions of the contract were within the scope of municipal power; that the contract was entered into by the proper agency of the City; that it was entered into in the mode provided for by statute; and that the trial court properly refused to issue any injunctive process in the action.

3 Tiffany, Real Property, Vol. 1, § 47, p. 120.

■ Appellant has assigned as error the refusal of the trial court to order the City to furnish a bill of particulars covering the details of the money expended on the wharf. It is claimed that section 3435, Comp.Laws of Alaska, 1933, gave appellant a right to such an order. The action of the trial court was proper. The cited section applies only in a case where an action is brought on an account. See, Williams v. Ingle, 1921, 99 Or. 358, 195 P. 570, 572; Alaska Co. v. Katzeek, 9 Cir., 1926, 16 F.2d 210, 211.

On appeal appellee has conceded the right of appellant taxpayer to bring this suit in equity [Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070]; but has argued that even assuming the contract to be invalid, appellant is not entitled to the relief sought, since the undisputed proof shows that the taxpayers, far from suffering, have been benefited through the acts complained of. Having found that the contract is valid in all its challenged provisions we need not decide this point.

Affirmed.