TRANS WORLD AIRLINES, Inc., a cor-
poration, Appellant,

v.

CITY AND COUNTY OF SAN FRANCIS-
CO, a municipal corporation, Phillip S.
Landis, Sam McKee, Victor S. Swanson,
Edward B. Baron and Donald A. Camer-
on, as members of the Public Utilities
Commission of the City and County of
San Francisco, G. M. Dixon, as Manager
and Chief Engineer of the San Fran-
cisco Airport, and J. M. Turner, Man-
ager of Utilities for the Public Utilities
Commission of the City and County of
San Francisco, Appellees.

No. 14523.

United States Court of Appeals
Ninth Circuit.

Dec. 19, 1955.

Rehearing Denied Jan. 31, 1956.

**474**

Pillsbury, Madison & Sutro, Eugene Prince, Noel Dyer, San Francisco, Cal., Wright, Wright, Green and Wright, Loyd Wright, Charles A. Loring, Los Angeles, Cal., for appellant.

Dion R. Holm, City Atty., Frank J. Needles, Deputy City Atty., Thomas M. O'Connor, Public Utilities Counsel, City and County of San Francisco, San Francisco, Cal., for appellees.

Before STEPHENS, ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

We have for determination the interesting question of whether or not the City and County of San Francisco, having contracted through its duly authorized officials to permit Trans World Airlines, Inc., to use "common use facilities" at the San Francisco International Airport, situate in San Mateo County, at fixed rates for a term of years, may thereafter, through its duly constituted Public Service Commission, change the contract rates.

In 1942 the City and County of San Francisco, hereafter City, entered into a formal agreement, executed and to. be performed in the state of California, with Trans World Airlines, Inc., here-after T.W.A., one of twelve scheduled airlines currently using the airport. The lease was for a twenty-year term, at charges fixed by the agreement. The property leased consisted of a hangar and certain space in the administration building and, in addition, certain "common use" facilities. Common use facilities are those areas and facilities used in common by the several airlines. Included in this category are landing fields, runways, aprons, taxi-ways, sewerage, water facilities, various lights and signals, control tower service and other conveniences supplied by the airport.

On November 20, 1950, after notice and hearing, the Public Utilities Commission of the City and County of San Francisco promulgated Resolution No. 11,182, thereafter duly approved by the Board of Supervisors of the City and County of San Francisco,[1] purporting to establish prescribed rates and charges for the use of the facilities of the airport. The resolution fixed the charges for the common use facilities at a figure higher than that set in the 1942 contract.

In January 1951 the City notified T.W.A. that T.W.A. would be expected to make payment for future use of the common use facilities at the rates fixed by the Commission's schedule. It gave notice that should T.W.A. fail to make such payments the City would deny to T.W.A. the right to refuel its planes at the airport. Thereupon T.W.A. sought an injunction against this threatened action and prayed for a declaratory judgment to the effect that its contract rates are binding on the City. The City defended on the ground that the 1942 contract was superseded by the Commission's resolution. The City withdrew its threat to deny refueling privileges and no hearing was held on the injunction issue. The District Court sustained the City's theory and entered judgment accordingly.

T.W.A. maintains that the City was granted express statutory authority to enter into the subject contract by section 4 of the Municipal and County Airport

---

1. Resolution No. 10,628, December 18, 1950.

Law, Cal.Stats.1927, p. 485, which was in force in 1942.[2] Section 4 provided, in part, as follows:

"In connection with the erection or maintenance of any such airport or airports, or air navigation facilities, any such city and county * * or any municipal corporation, shall have the power and jurisdiction * * to lease or assign for operation such space or area, appurtenances, appliances or other conveniences necessary or useful in connection therewith * * * to enter into contracts or otherwise co-operate with the federal government or other public or private agencies, and otherwise exercise such powers as may be required or convenient in the promotion of aeronautics and the furtherance of commerce and navigation by air."

This statute grants plenary authority to lease and contract. The use of the term "any such city and county" is a direct reference to San Francisco, which is the only combined city and county in the state.

It is not contended that in the execution of the contract the parties failed to observe any formalities necessary to the exercise of the powers conferred by the statute. The City takes the position, however, that the statute purports to regulate a "municipal affair" and thereby violates certain prohibitions of the state constitution.

Article XI, section 6 of the California constitution provides, in part, as follows:

" * * * Cities and towns hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, and cities and towns heretofore organized by authority of this Constitution may amend their charters in the manner authorized by this Constitution so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws. * * * "

Article XI, section 8(j) provides in part:

"It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

T.W.A. recognizes that the effect of Article XI is to preclude regulation by the state legislature of "municipal affairs" [3] but it contends that the operation involved in this suit is not included within the meaning of that term as used in Article XI.

█ The phrase "municipal affair" is a term of art. Its meaning as used in the constitution must be sought in the decisions of the California courts. The latter courts have repeatedly declared that a matter is not a "municipal affair" unless it is of strictly local interest. Any doubt is to be resolved in favor of state regulatory power. Thus, in Los Angeles Ry. Corp. v. City of Los Angeles, 16 Cal.2d 779, 783, 108 P.2d 430, 433, the Court said:

" * * * But the question here is disposed of by our conclusion that the facts disclose that the one-man or two-man operation of cars over the plaintiff's railway system is not a matter exclusively of municipal

2. The provision was repealed in 1949 but similar provisions were included in Government Code sections 50470–50478.

3. T.W.A. argues in the alternative that authority to enter into the subject contract is contained in the San Francisco Charter. We inquire first as to the applicability of the statutory authorization for the reason that the existence of such authorization is material to other questions presented by this case.

concern and is, therefore, not a municipal affair within the meaning of said sections of the Constitution; and that the question of such operation does not relate merely to the power to make and enforce local, police, sanitary or other regulations covering the plaintiff which it may be assumed has vested in the city of Los Angeles, pursuant to the provisions of said section 23; or, if it may be said to be a police regulation, that it relates to a matter which is not strictly a local affair and, therefore, has not been included in the reserved power."

To the same effect, see City of Los Angeles v. Post War, etc., Bd., 26 Cal.2d 101, 156 P.2d 746; Bay Cities Transit Co. v. City of Los Angeles, 16 Cal.2d .772, 108 P.2d 435; Civic Center Ass'n of Los Angeles v. Railroad Comm., 175 Cal. 441, 166 P. 351, and Pacific Tel. & Tel. Co. v. City of Los Angeles, 44 Cal.2d 272, 282 P.2d 36. See also, McQuillin, Municipal Corporations, 3rd Ed., § 4.85. The facts of the instant case place it much farther outside the orbit of a "municipal affair" than do those of any of the cases, supra.

The airport is not a strictly local affair. It is part of a global system of air transportation. Its value stems from the fact that it links the San Francisco area with other areas served by airports. It directly serves not only the City of San Francisco but all neighboring and outlying communities. The airport is used by military aircraft. Federal and state authorities regulate charges for common carrier air traffic.[4]

The City relies on the cases of Krenwinkle v. City of Los Angeles, 4 Cal.2d 611, 51 P.2d 1098, and Ebrite v. Crawford, 215 Cal. 724, 12 P.2d 937, in support of its contention that the airport is a "municipal affair." These cases, however, hold only that the maintenance and operation of a municipal airport is an activity in which a city may properly engage. In each case the Court cited the municipal and county airport law, supra, to show that the state had expressly authorized this activity. If the Supreme Court of California had viewed the operation of municipal airports as a "municipal affair" in the technical sense of those words, a matter thereby excluded from state regulation, it could not have regarded the municipal and county airport law as a source of authority to conduct such airports. These cases support the view that the conduct of municipal airports is a matter subject to state law.

■■ The authorities from other jurisdictions cited by the City are distinguishable.[5] They deal with the question of whether or not a city has sufficient interest in the construction and operation of an airport to justify the expenditure of municipal funds, the use of the tax power, the use of public properties or the use of condemnation proceedings. As the Supreme Court of California observed in the recent case of Pacific Tel. & Tel. Co. v. City of Los Angeles, supra, 44 Cal.2d at page 281, 282 P.2d 36, the fact that the city could lawfully regulate a business does not make the matter a "municipal affair" in the sense that the general state law is supplanted. We are persuaded that express statutory authorization existed for the execution of the 1942 agreement.

■ The City has bound itself as to rates and charges for the common use facilities by entering into a valid contract expressly authorized by state law. Even so, argues the City, the rate schedule of the contract was superseded by subsequent regulation by the Public Utilities Commission. In discussing this contention we assume arguendo that the

---

4. See 49 U.S.C.A. § 642; also, People v. Western Air Lines, Inc., 42 Cal.2d 621, 268 P.2d 723.

5. City of Wichita v. Clapp, 125 Kan. 100, 263 P. 12, 63 A.L.R. 478; Dysart v. City of St. Louis, 321 Mo. 514, 11 S.W. 2d 1045, 62 A.L.R. 762; City of Ardmore v. Excise Board, 155 Okl. 126, 8 P. 2d 2; State ex rel. City of Walla Walla v. Clausen, 157 Wash. 457, 289 P. 61; City and County of Denver v. Board of Commissioners, etc., 113 Colo. 150, 156 P.2d 101.

Public Utilities Commission's regulatory jurisdiction extends to the airport.[6]

The City had authority under this assumption to proceed by contract or by regulation. It elected to proceed by contract. The rule of law governing a subsequent attempt by the municipality to vitiate a contract such as that before us through subsequent exercise of its regulatory power is well stated in 43 Am. Jur., § 88:

"It has been held in numerous cases, however, that a state legislature unless prohibited by constitutional provision may authorize a municipal corporation to establish by an inviolable contract the rates to be charged by a public utility for a reasonable term of years, the effect of which is to suspend, during the life of the contract, the governmental power of the state or municipality to fix or regulate the rates." See also, Annotation 74 L.Ed. 234, 236, to the same effect.

Authorities sustaining this rule are St. Cloud Public Service Co. v. City of St. Cloud, 265 U.S. 352, 44 S.Ct. 492, 68 L. Ed. 1050; City of Vicksburg v. Vicksburg Waterworks Co., 206 U.S. 496, 27 S.Ct. 762, 51 L.Ed. 1155, and Femmer v. City of Juneau, 9 Cir. 1938, 97 F.2d 649.[7] In the Vicksburg case the Supreme Court held, 206 U.S. at page 508, 27 S.Ct. at page 766:

"That a state may, in matters of proprietary rights, exclude itself from the right to make regulations of this kind or authorize municipal corporations to do so, when the power is clearly conferred, has been too frequently declared to admit of doubt. [City of] Los Angeles v. Los Angeles City Water Co., 177 U.S. 558, 20 S.Ct. 736, 44 L.Ed. 886; [City of] Walla Walla v. Walla Walla Water Co., 172 U.S. 1–7, 19 S.Ct. 77, 43 L.Ed. 341–344; New Orleans Waterworks Co. v. Rivers, 115 U.S. 674, 6 S.Ct. 273, 29 L.Ed. 525; Freeport Water Co. v. Freeport, 180 U.S. 587–593, 21 S.Ct. 493, 45 L.Ed. 679–686."

In the instant case the statutory authority conferring the power to contract was more express than that found sufficient in the cases above cited.

■■ The City cites a line of cases holding that contracts entered into by a public utility and a private party are subject to superseding subsequent rate making regulation.[8] The law to that effect is well settled, see Annotation 9 A. L.R. 1423. Such contracts are subject to a condition implied in law that rates and charges may be superseded by utility regulation. Where, however, the municipality enters into a contract pursuant to express statutory authority to contract, the courts have recognized that the specific authority to contract, insofar as this authority conflicts with the general power conferred on the municipality to regulate public utility rates, should prevail.

6. T.W.A. urges that the airport is not a public utility and therefore not subject to regulation by the Commission, that even if it be subject to regulation the Commission has not lawfully exercised its regulatory power in that there has been no finding after hearing that the contract rate was excessive and finally that the terms of the Commission's resolution exempted the subject contract. The resolution provided that the rates prescribed were adopted "except as otherwise provided, or amended by agreement."

7. Cf. Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176.

8. Pinney & Boyle Co. v. Los Angeles Gas, etc., Corp., 168 Cal. 12, 141 P. 620, L.R.A.1915C, 282; Law v. Railroad Comm., 184 Cal. 737, 195 P. 423, 14 A.L.R. 249; Market St. R. Co. v. Pac. Gas & Elec. Co., D.C.N.D.Cal.1925, 6 F.2d 633, appeal dismissed 271 U.S. 691, 46 S.Ct. 487, 70 L.Ed. 1154; Sutter Butte Canal Co. v. Railroad Comm., 202 Cal. 179, 259 P. 937, affirmed 279 U.S. 125, 49 S.Ct. 325, 73 L.Ed. 637; Midland Realty Co. v. Kansas City Power & Light Co., 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540, rehearing denied 300 U.S. 687, 57 S.Ct. 504, 81 L.Ed. 888; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309.

478

In Limoneira Co. v. Ry. Comm., 174 Cal. 232, at page 238, 162 P. 1033, at page 1036, the Supreme Court of California recognized the distinction between the two lines of authority, stating:

"The uniform course of decision of the United States Supreme Court on questions similar in principle precludes any claim that the exercise by the state of the power to thus affect such an existing contract as that here involved impairs the obligation of contract within the meaning of the federal Constitution. We are speaking, of course, of a situation where the state cannot be held as a matter of fact to have surrendered to the public utility involved, by something tantamount to a contract between it and the public utility, any portion of this regulatory power * * *."

The trial court attempted to distinguish the St. Cloud and Vicksburg cases, supra, on the theory that these decisions apply only to charges applicable "not to any one customer, but to all members of the public served," whereas in the present case the contract is between a municipality and a single customer. We think, however, that the instant case falls within the principle stated in the St. Cloud and Vicksburg decisions. If the municipality may be deemed as in the St. Cloud and Vicksburg cases to have surrendered its regulatory power as to the entire public, certainly it has the lesser power to suspend its rate-making authority as to a single customer. In Femmer v. City of Juneau, supra, this court decided that a municipality could so do. We conclude that insofar as the resolution of the Public Utilities Commission purported to abrogate the rates and charges fixed by the 1942 contract the resolution was void.

The City further contends that the rates and charges pertinent to the common use facilities are governed by the provisions of the contract wherein T. W.A. is authorized to use the said facilities "on the same terms and conditions as apply to others." This provision is followed, however, by a lengthy designation of fees which purports to set up an elaborate rate schedule. There can be no doubt on a reading of the agreement that the latter was intended to fix the rates and charges for the common use facilities.

Reversed.