IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| FRIENDS OF NORTH SPOKANE COUNTY PARKS, | ) ) ) | No. 32056-1-III |
| Appellant, | ) ) ) | |
| v. | ) ) | |
| SPOKANE COUNTY; FRED MEYER STORES, INC.; and, STAR SAYLOR LLC, | ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) ) | |

SIDDOWAY, C.J. — After the Board of County Commissioners of Spokane County

(Board) amended its acceptance of dedicated parkland to permit construction of a road

serving an adjoining residential development, Friends of North Spokane County Parks, an

association of county taxpayers and itself a county taxpayer, challenged the legality of the

Board's action. The superior court dismissed Friends' action on standing and substantive

grounds, for failure to state a claim on which relief could be granted. Friends appeals the

dismissal and the superior court's denial of its motion to disqualify the Spokane County

prosecutor from representing an affiliate of the grantor of the parkland.

In concluding that Friends did not have standing, the trial court relied on a

decision involving distinguishable facts, whose overly-narrow characterization of

taxpayer standing we reject. Friends adequately alleged taxpayer standing under controlling Washington case law. While the trial court properly denied Friends' disqualification motion and correctly dismissed claims alleging breach of trust and an unconstitutional gift of public property, Friends' complaint adequately stated a claim for breach by the county of terms of a 2001 dedication of the parkland. We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL BACKGROUND

In 2001, in connection with the development by Roundup Company of real property near the corner of U.S. Highway 395 and Hastings Road for construction of a Fred Meyer store, Roundup offered 3.99 acres of undeveloped land directly south of the store site to Spokane County for use as a park. The county was receptive, so in August 2001 the Wilmington Trust Company, which held title to the 3.99 acres as security, conveyed the land to the county. The deed required that the land be held "only as a natural, community, or regional park" and prohibited "vehicular ingress or egress from the property" except from Standard Drive. Clerk's Papers (CP) at 62. The county accepted the donation by resolution, subject to these conditions. After accepting and receiving the property, the county maintained what came to be known as "Freddy Park" as a "natural, unimproved park." CP at 70.

In 2007, Star Saylor Investments LLC, a private real estate developer that owns property located directly south of Freddy Park, applied to the county for a preliminary

2

plat. A county hearing examiner approved the application subject to conditions, one of which was that before the final platting of the 34th lot, "'the applicant shall secure and construct a second ingress/egress roadway to serve the proposed development.'" CP at 5. The condition stated that "'[t]he proposed second access must be dedicated through the park land owned by Spokane County north of the site.'" *Id.* at 5-6.

The county's Board of County Commissioners favored allowing construction of the second ingress/egress roadway through Freddy Park. Out of concern that its authority to approve construction of a road might be questioned in light of the 2001 deed and restrictions, the county asked that Roundup and its affiliates Fred Meyer Inc. and Fred Meyer Stores Inc., whom the county referred to collectively as "the Fred Meyer Parties," execute an amendment to the 2001 deed allowing the establishment and construction of a public road. The Fred Meyer Parties agreed, but only if the county would represent and defend them in the event of litigation resulting from the amendment. The county agreed that it would. The county and the Fred Meyer Parties then executed an amendment to the restrictions imposed by the 2001 conveyance to permit construction of a road "'as depicted in the attached Exhibit "C"'" to their amendment. CP at 94. Exhibit C depicted the road as follows:



CP at 110.

In 2013, Friends of North Spokane County Parks, a nonprofit corporation, sued Spokane County, Fred Meyer Stores Inc. (Fred Meyer), and Star Saylor. It sought a declaratory judgment that the county could not approve construction of a road through Freddy Park, and to enjoin construction. It asserted standing based on the fact that it and its members were Spokane County taxpayers; that its members lived near, and were interested in protecting and preserving the park; and that its request that the state's attorney general take action to prevent the construction had been declined.

Friends' complaint contended that the county commissioners' actions amending the resolution and approving the road were illegal in light of the original deed

4

restrictions, which it alleged the county had no authority to change; that the county had no authority to renege on alleged trust duties; that the amendment could not be effective because, according to records of the county, the original grantor, Wilmington Trust, no longer existed as an entity; and that for the county to provide Star Saylor with a road through Freddy Park would constitute a gift of public property or funds in violation of article VIII, section 7 of the Washington Constitution.

Star Saylor soon moved the trial court to dismiss the complaint pursuant to CR 12(b)(6) for failure to state a claim on which relief could be granted. After the county and Fred Meyer both appeared through the Spokane County Prosecuting Attorney to join in the motion, Friends moved to disqualify the prosecutor from representing Fred Meyer, alleging a conflict of interest.

The trial court denied Friends' motion to disqualify the county prosecutor and granted Star Saylor's motion to dismiss Friends' complaint. In dismissing the complaint, the court ruled:

> 1. Friends has not alleged and can not allege that it is: (a) a grantee or grantor; or (b) a successor to a grantee or grantor with respect to the 2001 deed between Wilmington Trust Company and Spokane County.
> 2. Friends has not alleged and can not allege facts sufficient to confer taxpayer standing because it has not alleged and can not allege a taxpayer cause of action, nor that Friends pays the type of taxes "funding" the project that is the subject matter of this action.
> 3. Accordingly, Friends does not have standing to pursue Counts 1-5, as alleged in the Amended Complaint.
> 4. Further, Friends has not alleged and can not allege facts sufficient to pursue a claim under Article VIII, section 7 of the Washington State

5

Constitution (Count 6 of the Amended Complaint), because there has been
no transfer or public property and there is no donative intent.

CP at 213-14.  Friends timely appealed.

## ANALYSIS

Friends assigns error on appeal to the trial court's orders dismissing its complaint

under CR 12(b)(6) and denying its motion to disqualify the county prosecutor from

representing Fred Meyer.  It argues (1) that it has taxpayer standing; (2) that "[u]sing

Freddy Park for a roadway would violate the terms of the deed under which the County

accepted Freddy Park, which specifically limits the uses of the park"; (3) to use Freddy

Park "for a roadway for a private developer . . . [or] for any other purpose . . . would be a

violation of Art. VIII, Section 7"; and (4) the amendment document was "void because

the Grantor did not have any interest in the property at the time."  Br. of Appellant at 8.

It argues that the county prosecutor should have been disqualified on account of a

nonconsentable conflict of interest.

We address the issues in turn.

### I.  Taxpayer Standing

"Standing is a 'party's right to make a legal claim or seek judicial enforcement of

a duty or right.'" *State v. Link*, 136 Wn. App. 685, 692, 150 P.3d 610 (2007) (quoting

BLACK'S LAW DICTIONARY 1442 (8th ed. 2004)).  "It is the responsibility of the

complainant clearly to allege facts demonstrating that he is a proper party to invoke

judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).

Friends alleged in support of its standing that

7.    The membership of Friends consists of state of Washington and Spokane County taxpayers who live near, and are interested in, protecting and preserving Freddy Park.

8.    Friends, in its own right, is also a Washington taxpayer to the state and to Spokane County as the result of payment of Washington and Spokane County sales taxes.

9.    Plaintiff has made a request of Attorney General of Washington to take the action sought in this case. The essence of the letter is this:
      By this letter Friends requests that you take action to prevent Spokane County from violation of law regarding use of Freddy Park for a secondary access road for the benefit of a real estate developer.

10.   By letter dated January 17, 2013, the Washington Attorney General, by Jeffrey T. Even, Deputy Solicitor General, declined to take action on Plaintiff's request.

CP at 19-20.

The trial court's reasons for concluding that Friends lacked standing were, again, that it was not a party or a successor in interest to the 2001 deed between Wilmington Trust Company and the county, and it had not and could not allege facts establishing taxpayer standing. Friends concedes it is not a party to the deed. At issue is only whether its complaint supports its taxpayer standing. We review questions of standing de novo. *Link*, 136 Wn. App. at 692.

Although the standing doctrine generally "prohibits a litigant who is not adversely affected by a public act or statute from asserting the legal rights of another," Washington

7

courts have long recognized the right of an individual or entity "to challenge governmental acts based solely upon the litigant's status as a taxpayer." *Greater Harbor 2000 v. City of Seattle*, 132 Wn.2d 267, 281, 937 P.2d 1082 (1997); *accord State ex rel. Boyles v. Whatcom County Superior Court*, 103 Wn.2d 610, 614, 694 P.2d 27 (1985); *Wash. Pub. Trust Advocates ex rel. City of Spokane v. City of Spokane*, 117 Wn. App. 178, 182, 69 P.3d 351 (2003); *Robinson v. City of Seattle*, 102 Wn. App. 795, 804-05, 10 P.3d 452 (2000).[1]

Washington courts have held that municipal taxpayers have standing to challenge not only the disposition of municipal funds, but also municipal property. In *Miller v. City of Pasco*, 50 Wn.2d 229, 310 P.2d 863 (1957), for example, the court held that a taxpayer could sue, seeking a declaratory judgment as to the constitutionality of a statute authorizing the city to lease its property for parking lot purposes and to enjoin the city from leasing or disposing of the property. In *Donald v. City of Vancouver*, 43 Wn. App. 880, 719 P.2d 966 (1986), the court held that the plaintiff lacked standing to challenge the

---

[1] An exception is cases involving a reduction of taxes, in which courts have been reluctant to grant taxpayer standing. *Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 529, 219 P.3d 941 (2009) ("While taxpayers may have standing to protest high taxes or improper expenditures, this court has said it is doubtful there is taxpayer standing to protest lower taxes or limits on taxation."); *Walker v. Munro*, 124 Wn.2d 402, 419-20, 879 P.2d 920 (1994) ("Although a taxpayer need not allege a personal stake in the matter, but may bring a claim on behalf of all taxpayers, it is more questionable whether taxpayer standing is appropriate to protest legislation which, by the Petitioners' own claims, will decrease state expenditures and make the raising of taxes more difficult." (Citation omitted.)).

city's failure to comply with a deed condition requiring use of donated property as a park, but only because the grantor imposed conditions subsequent that only the grantor, not the public, could enforce: the grantor did not dedicate the property to public use. The court recognized that had the grantor's conveyance been a dedication, then the plaintiff, as a resident "and, presumably, a taxpayer, could dispute the City's action, because taxpayers of a local government can hold the governmental entity to dedicated uses." *Id.* at 886.

Star Saylor nonetheless relies on *Dick Enterprises, Inc. v. King County*, 83 Wn. App. 566, 572-73, 922 P.2d 184 (1996), for the proposition that "[i]n order to bring a taxpayer suit . . . [a]mong other things, the plaintiff must show that it pays the type of taxes funding the project [that is the subject matter of the action]." It persuaded the trial court that because the ingress/egress road would be constructed by Star Saylor, there was no public funding to which Friends' taxes would be applied.

*Dick Enterprises* was a challenge to an award of a public works contract by a disappointed bidder, Dick/Cree Joint Venture. Dick/Cree—the second lowest bidder for a county contract—contended that the lowest bid was nonresponsive to terms of the county's solicitation of bids. It did not commence suit until after the contract between the county and the successful bidder had been signed. The trial court rejected Dick/Cree's *bidder* standing to challenge performance of the contract based on the primary policy of competitive bidding statutes to protect the public purse, with "[t]he bidder's interest in a fair forum [being] secondary." *Id.* at 569. Reasoning that "courts may refuse to

recognize a cause of action where the lawsuit would work against the purposes of the underlying statute," it held that "[p]rivate suits are motivated by the bidder's desire to rebid and improve its chances to obtain an award," and that "[t]he best way to ensure that lawsuits are brought in the public interest is to restrict standing to those whose rights are at stake—the taxpayers." *Id.* at 570.

The court's problematic statement about taxpayer standing was made later in its decision, where it summarily rejected Dick/Cree's alternative argument that even if public policy prevented it from suing as an unsuccessful bidder, it had adequately pleaded a taxpayer's suit. The court pointed out that Dick/Cree had not shown that it requested action by the state's attorney general before bringing suit and that "[a]mong other things, the plaintiff must show that it pays the type of taxes funding the project." *Id.* at 573. For the quoted proposition, it cited as authority only 18 Eugene McQuillin, *The Law of Municipal Corporations* § 52.12 (3d ed. rev. vol. 1993). Consistent with *Dick Enterprises*, the cited section of the 1993 McQuillin treatise states that taxpayer standing requires that a taxpayer "be a contributor to the particular fund from which public monies are or will be expended"—but the only authority it cites for the proposition is a 1989 decision of the Supreme Court of Hawaii. 18 MCQUILLIN, *supra*, § 52.12, at 20, 23 n.14 (citing *Haw.'s Thousand Friends v. Anderson*, 70 Haw. 276, 768 P.2d 1293 (1989)).

No other Washington decision requires as a condition of taxpayer standing that the plaintiff trace the source of funding for a challenged expenditure to the type of taxes he or

10

she pays. And states vary in the nexus they require between a plaintiff's status as a taxpayer and the subject matter of his or her suit. A recent law review article surveying the permissive taxpayer standing doctrines in place in most states (as contrasted with restrictive standing rules applied in federal court) discusses different nexus requirements. It identifies only Arkansas, Iowa, Maine, and Minnesota as examples of those states that limit standing to challenge a state expenditure involving a specific fund to a taxpayer who has paid into that fund. Joshua G. Urquhart, *Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines*, 81 FORDHAM L. REV. 1263, 1279 nn.108 & 119 (2012). It characterizes other states as requiring that the plaintiff be challenging government action that "theoretically affects his or her tax burden" or "that has the potential to affect his or her tax burden, even if only in a minute way." *Id.* at 1278-79, 1281. It characterizes "a handful of states" as "allow[ing] taxpayers to challenge virtually any government conduct, regardless of how it affects state taxpayer dollars," observing that "[t]axpayer actions in these jurisdictions are little more than citizen lawsuits with the extra requirement that the plaintiff has paid taxes." *Id.* at 1281-82.

Review of Washington cases convinces us that *Dick Enterprises'* reliance on McQuillin to require that a taxpayer plaintiff paid the tax that funds a challenged government action was inconsistent with controlling Washington case law. This becomes clear from review of a long line of decisions distinguishing attempted taxpayer challenges

to allegedly illegal government actions from challenges based on other objections not involving illegality.

A litigant seeking to challenge a discretionary governmental act, as opposed to an allegedly unlawful act, must show a special injury. In those cases, the plaintiff taxpayer "must show that he or she has a unique right or interest that is being violated, in a manner special and different from the rights of other taxpayers." *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991); *Kightlinger v. Pub. Util. Dist. No. 1 of Clark County*, 119 Wn. App. 501, 81 P.3d 876 (2003), *review granted and case dismissed*, 152 Wn.2d 1001 (2004), *rev'd on other grounds by Okeson v. City of Seattle*, 159 Wn.2d 436, 452 n.5, 150 P.3d 556 (2007); *see, e.g., In re Petition of City of Bellingham*, 52 Wn.2d 497, 499, 326 P.2d 741 (1958) ("The mere fact that a resident taxpayer and citizen disagrees with a discretionary decision of the city council provides no basis for a suit challenging the validity of the council's action.").

When it comes to taxpayer plaintiffs challenging the legality of a governmental act, however, Washington courts have repeatedly held that no special injury need be shown. And the reasoning of those decisions reveals an appreciation of the role that taxpayer suits play in correcting government transgressions and that no nexus is required between the type of taxes paid by the taxpayer plaintiff and the challenged act.

In *Barnett v. Lincoln*, 162 Wash. 613, 299 P. 392 (1931), the port of Seattle, accused of violating state law by failing to require its lessee to post a performance bond,

argued that it could not be restrained at the instance of a taxpayer because there was no

showing that its omission would result in special damage to the taxpayer or general

damage to the taxpaying public. Rejecting the port's argument, the court observed that

"[c]ourts generally hold that, if the *illegal acts* of a municipal corporation are such as to

increase taxes or *violate public rights*, any taxpayer may bring suit for injunction, and it

is not necessary for him to show special pecuniary damage to himself, general damage to

the taxpaying public being held sufficient." *Id.* at 622 (citing 4 JOHN F. DILLON,

COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS §§ 1579-1587 (5th ed.

1911)).

In 1954, *State ex rel. Lemon v. Langlie*, 45 Wn.2d 82, 88, 273 P.2d 464 (1954)

rejected the argument that a private citizen or taxpayer could not maintain an action

against state officers on a matter of public concern "'except upon a showing of some

special interest or damage different than that suffered by the public at large.'"

Significantly, it did so after surveying 10 prior decisions that the respondents argued

required a taxpayer plaintiff to show a direct pecuniary injury and observing that the

same requirement of personal pecuniary effect had been rejected 7 years earlier in *Reiter*

*v. Wallgren*, 28 Wn.2d 872, 184 P.2d 571 (1947). It quoted *Reiter* as stating, "'We never

have held that, in a proper case *where the attorney general refused to act to protect the*

*public interest*, a taxpayer could not do so.'" *Langlie*, 45 Wn.2d at 88 (quoting *Reiter*, 28

Wn.2d at 876).

13

A decade later, the court in *Fransen v. State Board of Natural Resources*, 66 Wn.2d 672, 676, 404 P.2d 432 (1965) recognized the right of taxpayers to sue to enjoin the Board of Natural Resources from selling forest lands to a city, even though the taxpayer plaintiffs were "not persons whose property rights or interests will be affected by the sale of the lands," but merely "taxpayers, whose interest in the subject matter of the action is no different from that of other taxpayers."

Relying on *Fransen*, the court in *Calvary Bible Presbyterian Church of Seattle v. Board of Regents of University of Washington*, 72 Wn.2d 912, 917, 436 P.2d 189 (1967) granted standing to church ministers, but denied standing to the churches themselves, based on the requirement that "plaintiff must at least be a taxpayer." And a taxpayer had standing in *Boyles*, 103 Wn.2d at 611 to enjoin county officials from assigning prisoners to a work release program that mandated religious activities. Since the plaintiff "sought and [had] been denied enforcement of her complaint by the Attorney General" the court found standing based solely "on the basis of taxpayer status." *Id.* at 615. The court emphasized that "taxpayer standing has been given freely in the interest of providing a judicial forum when this state's citizens contest the legality of official acts of their government." *Id.* at 614.

The rationale for requiring only taxpayer status and an unsuccessful demand that the attorney general commence action, gleaned from almost a century's worth of Washington case law, is that all taxpayers are presumed harmed where a government

entity acts unlawfully. In *Barnett*, 162 Wn.2d at 623, the court reasoned that where a city

"enter[s] into an illegal or ultra vires contract, and ignores the statutory safeguards . . . , it

is a fair presumption that every taxpayer will be injured in some degree by such illegal

act." This court observed in *Eugster v. City of Spokane*, 139 Wn. App. 21, 28, 156 P.3d

912 (2007) that while an individual taxpayer must generally show special injury to sue a

municipality, "every taxpayer is presumed injured if the city acts illegally." In *Mincks v.

City of Everett*, 4 Wn. App. 68, 73, 480 P.2d 230 (1971) the court held that the taxpayer

plaintiff had standing to challenge the legality of a contract given that "every taxpayer

will be fairly presumed to be injured when a municipal corporation undertakes to enter an

illegal contract."

The Washington Supreme Court's most recent pronouncement on the issue of

taxpayer standing is its split decision in *Greater Harbor*. The justices' reasoning, while

divided as to other matters, reveals broad support for recognizing taxpayer standing to

challenge illegal government acts. At issue was whether Greater Harbor, a private

interest group consisting of a Washington nonprofit corporation and individual taxpayers,

had standing to challenge the city's decision to grant preliminary approval of a petition

by the port of Seattle to vacate several acres of public streets. *Greater Harbor*, 132

Wn.2d at 269, 271.

The lead opinion, signed by two justices, ruled that the plaintiffs lacked standing

because even though they were taxpayers, they were not abutting property owners. *Id.* at

15

284. It cited *Boyles* for the principle that "taxpayer standing has been given freely in the interest of providing a judicial forum for citizens to contest the legality of official acts of their government," but characterized Greater Harbor as having "[a]t most . . . merely disagree[d]" with the decision to vacate based on its interpretation of the city's code. *Id.* at 281-82. Three justices concurred in the result, but on ripeness grounds, implicitly rejecting the conclusion of the two-member lead opinion that the plaintiffs lacked standing. *Id.* at 285 (Johnson, J., concurring). Another two justices agreed dismissal was appropriate because there had been no violation of the city's code, but explicitly disagreed that the plaintiffs lacked standing, emphasizing that "[t]axpayers clearly should have standing to complain about the legality of the City's governmental act." *Id.* at 287 (Madsen, J., concurrence/dissent). Finally, two justices dissented on the basis that taxpayer standing was improperly denied, and that the city had violated its ordinance. *Id.* at 290 (Sanders, J., dissenting).

Aside from *Dick Enterprises*, the only other authority Star Saylor cites in support of its contention that Friends must allege that its taxes will fund some aspect of the challenged roadway are one concurrence and one dissent by members of the Washington Supreme Court, both of which quote *Dick Enterprises*. *See City of Seattle v. McKenna*, 172 Wn.2d 551, 565, 259 P.3d 1087 (2011) (Alexander, J., concurring); *Greater Harbor*, 132 Wn.2d at 299 (Sanders, J., dissenting). But the statement quoted by both justices is, for present purposes, a neutral one: that a taxpayer's complaint must allege both a

16

taxpayer's cause of action and facts supporting taxpayer status. Star Saylor urges us to view the statement as weighing in its favor, arguing that "[a] taxpayer cause of action is a cause of action in which there is an alleged burden on taxpayers associated with the government action." Br. of Resp't Star Saylor at 9. But *Dick Enterprises* does not define "taxpayer's cause of action" that way, and neither Justice Alexander nor Justice Sanders appear to share Star Saylor's understanding of "taxpayer's cause of action." Substantively, neither Justice Alexander's concurrence in *McKenna* nor Justice Sanders' dissent in *Greater Harbor* support Star Saylor's position on standing.

Viewed as a whole, Washington cases recognize a plaintiff's standing to challenge the legality of governmental action based solely upon the plaintiff's status as a taxpayer and his or her prior demand on the attorney general. Friends' complaint alleged the required prior demand and challenges the legality of the county's reliance on the 2012 amendment to violate restrictive covenants contained in what it contends was a 2001 dedication of a public park use. The trial court erred in dismissing Friends' complaint for lack of standing to the extent that it alleged illegal action.[2]

---

[2] Star Saylor devoted a portion of its brief to argument that we should affirm the trial court because Friends failed to assign error to any of the court's findings of fact, which it contends is required by RAP 10.3(g). A motion to dismiss a complaint pursuant to CR 12(b)(6) does not call upon the trial court to determine issues of fact and we review its decision de novo. Findings of fact and conclusions of law are therefore superfluous. Implicitly, the requirement of RAP 10.3(g) applies only when a trial court's findings are appropriately entered and necessary to our review.

17

## II. Deed Restrictions

Turning to the substantive sufficiency of Friends' complaint, we first state the standard of review. "A CR 12(b)(6) motion questions only the legal sufficiency of the allegations in a pleading." *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 298 n.2, 545 P.2d 13 (1975). It cannot be granted unless "it appears beyond a reasonable doubt that no facts exist that would justify recovery." *Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994). The court "accept[s] as true the allegations in a plaintiff's complaint and any reasonable inferences therein." *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998).

Documents whose contents are alleged in a complaint but not attached may be submitted for consideration in ruling on a CR 12(b)(6) motion without converting the motion into one for summary judgment, especially if the parties do not dispute the authenticity of the documents and they do not constitute testimony. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 175 Wn. App. 840, 865-66 & n.63, 309 P.3d 555 (2013) (citing *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 726 & n.45, 189 P.3d 168 (2008) (relying on federal authority)), *aff'd*, 180 Wn.2d 954, 331 P.3d 29 (2014). We review de novo a trial court's order granting a CR 12(b)(6) motion to dismiss. *Reid*, 136 Wn.2d at 200-01.

Friends' complaint includes the following allegations (among others) in support of

its contention that the restrictions originally imposed on the use of Freddy Park by the

2001 deed and restrictions may not be amended by the county and Fred Meyer:

12. Prior to July 24, 2001, Roundup Company . . . approached Spokane County with its desire of donating a 3.99 acre parcel of property to the County to be used only as a "County-owned and operated natural or community Park."

13. Spokane County, by Resolution Number 1-0660, accepted the donation on July 24, 2001.

14. Spokane County specifically agreed to accept the property for park purposes . . . that is for "a natural, community or regional park" without roads passing through Freddy Park.

. . . .

26. On November 7, 2012, Spokane County adopted Resolution 12-0910 which authorized the County to sign a document entitled "Amendment to Restrictions on Use and Development of Property" pursuant to which Fred Meyer Parties and Spokane County will amend Exhibit B to the documents entitled "Deed with Covenant and Joinder with Warranties and Title to Real Property" . . . .

. . . .

30. Spokane County and Fred Meyer Stores, Inc. have signed a document entitled "Amendment to Restrictions on Use and Development of Property" dated November 19, 2012.

. . . .

57. . . . [T]he County cannot make the park property available for a road because to do so would violate the "Restrictions on Use and Development of Property" as contained in Exhibit B to the Deed filed with the Spokane County Auditor on August 22, 2001 . . . .

58. The changes to the deed restriction set forth in the document filed April 4, 2013 are not effective and are void or in excess of the authority of the County Commissioners.

. . . .

60. . . . The road through the park for use by the Developer is not a park use. Indeed, a road through the park for any reason, except for the purposes of the park would not be a park use.

19

CP at 20-28.

Also before the trial court was the deed itself, which read in material part:

> The Grantor, WILMINGTON TRUST COMPANY, . . . not in its individual capacity, but solely as Owner Trustee under the FMS Trust 1997-1 . . . bargains, sells and conveys to SPOKANE COUNTY, . . . Grantee, the real property described on the attached Exhibit A, TOGETHER WITH all the tenements, hereditaments and appurtenances belonging thereto, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right and title to the property whether in law or in equity, and subject to the Restrictions on Use and Development of Property as stated in Exhibit B, and the encumbrances shown on Exhibit C.
>
> TO HAVE AND TO HOLD all and singular the above mentioned and described real property, together with appurtenances thereof, unto the Grantee, and its heirs, successors and assigns forever.

CP at 53 (boldface and underline omitted).

The incorporated "Restrictions on Use and Development of Property" set forth in the attached Exhibit B read in their entirety:

> The herein described real property shall be held, conveyed, sold, and improved only as a natural, community, or regional park. This condition and restriction of use shall constitute a covenant and encumbrance which shall run with the land and shall be perpetually binding upon Grantee, its successors-in-interest and assigns, and all parties having or acquiring any right, title, or interest in, or to, any part of the subject property.
>
> There shall be no vehicular ingress or egress from the property to the adjacent property owned by Grantor, Parcels A and G of BSP-58-97. Vehicular access to the property shall be only from Standard Drive.
>
> A pedestrian walkway to Parcel G may be allowed subject to Grantor's review and approval of the location, design, and construction of the walkway.
>
> Grantee shall install and maintain a fence within the boundaries of the property along the adjacent boundaries of Parcels A and G. The design, materials and height of the fence shall be subject to approval by Grantor.

CP at 62.

The Board's Resolution No. 1-0660, adopted in July 2001, recited the

circumstances and terms of the proposed deed and provided:

> NOW, THEREFORE, BE IT HEREBY RESOLVED . . . that the
> Board does hereby accept the donation of the 3.99-acre parcel of land from
> Roundup Company subject to the terms and conditions set forth within the
> recital herein above and in conjunction herewith does authorize either the
> Chairman of the Board of County Commissioners of Spokane County or a
> majority of the Board to execute at another than an open meeting any and
> all necessary documents in connection with the donation.

CP at 65 (boldface omitted).

Finally, the Board's Resolution No. 12-0910, adopted in November 2012,

described the county hearing examiner's condition requiring that Star Saylor secure a

second ingress/egress through Freddy Park, stated that the county, in consultation with its

own traffic engineers, the Washington State Department of Transportation, and the local

fire district had determined that the road connection would be beneficial to area traffic

circulation, and went on to provide:

> WHEREAS, a question has arisen whether the existing restrictive
> covenant language in the above recital would permit the establishment and
> construction of a public road across the Subject Real Property. To avoid
> any issues regarding interpretation of the restrictive covenant, the FRED
> MEYER PARTIES and Spokane County wish to amend the restrictive
> covenant to allow for the establishment and construction of a public road
> across the Subject Real Property.
> NOW, THEREFORE, BE IT RESOLVED . . . that the chairman of
> the Board . . . on behalf of the Board and Spokane County, be and is hereby
> authorized to execute that document entitled "AMENDMENT TO

> RESTRICTIONS ON USE AND DEVELOPMENT OF PROPERTY"
> pursuant to which FRED MEYER PARTIES and Spokane County will
> amend "EXHIBIT 'B'" to documents entitled "DEED WITH
> COVENANT" and "JOINDER WITH WARRANTIES TO TITLE TO
> REAL PROPERTY" . . . to provide as follows:
>> The herein described real property described shall be held,
>> conveyed, sold, and improved as a natural, community, or
>> regional park *and for the establishment of a public road as
>> depicted in the attached Exhibit "C."* This condition and
>> restriction of uses shall constitute a covenant and
>> encumbrance which shall run with the land and shall be
>> perpetually binding upon the Grantee, its successors-in-
>> interest and assigns and all parties having or acquiring any
>> right[,] title, or interest in, or to, any part of the subject
>> property.

CP at 70-71 (emphasis added) (boldface omitted). Aside from the italicized language, the provisions of the 2001 restrictions remained unchanged. The amendment was signed by the county and Fred Meyer Stores Inc.

A dedication is generally defined as the devotion of property to a public use by an unequivocal act of the owner, manifesting an intention that it shall be accepted and used now or in the future. 11A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 33.02, at 308-09 (3d ed. rev. vol. 2000). No particular acts, ceremonies, or special language is required to effectuate a dedication. *Id.* at 311-12. "A deed given to a municipality may operate as a dedication where it provides for a particular use of the property conveyed." *Id.* at 319-20.

Dedications may be classified as common law or statutory. *Sweeten v. Kauzlarich*, 38 Wn. App. 163, 165, 684 P.2d 789 (1984) (citing 26 C.J.S. *Dedication* § 1,

22

at 399 (1956)). Statutory dedications operate by way of grant, and in Washington are provided for by RCW 58.08.015, which provides:

> Every donation or grant to the public . . . marked or noted as such on the plat of the town, or wherein such donation or grant may have been made, shall be considered, to all intents and purposes, as a quitclaim deed to the said donee or donees, grantee or grantees, for his, her or their use, for the purposes intended by the donor or donors, grantor or grantors, as aforesaid.

Common law dedications, by comparison, are controlled by common law principles, and operate by way of equitable estoppel. *Kiely v. Graves*, 173 Wn.2d 926, 932, 271 P.3d 226 (2012). "A common law dedication is the designation of land, or an easement on such land, by the owner, for the use of the public, which has been accepted for use by or on behalf of the public." *Richardson v. Cox*, 108 Wn. App. 881, 890, 26 P.3d 970, 34 P.3d 828 (2001).

To find a dedication, there must be "'(1) An intention on the part of the owner to devote his land, or an easement in it, to a public use, followed by some act or acts clearly and unmistakably evidencing such intention; and (2) an acceptance of the offer by the public.'" *Sweeten*, 38 Wn. App. at 165 (quoting *City of Seattle v. Hill*, 23 Wash. 92, 97, 62 P. 446 (1900)). "'[W]hen the intention of the owner to dedicate is clear, manifest, and unequivocal . . . it becomes effective for that purpose.'" *City of Spokane v. Catholic Bishop of Spokane*, 33 Wn.2d 496, 503, 206 P.2d 277 (1949) (quoting *Corning v. Aldo*, 185 Wash. 570, 576, 55 P.2d 1093 (1936)). The burden of proof to establish a dedication

23

is on the party asserting it. *Lopeman v. Hansen*, 34 Wn.2d 291, 294, 208 P.2d 130 (1949).

"[I]f parkland is subject to a dedication, . . . any diversion from the dedicated purpose is illegal." *Donald*, 43 Wn. App. at 886.

> "It is doubtless the law that, where a person dedicates or donates to a city a tract of land, with a restriction upon its use—as for instance, where it is so dedicated or donated solely for a park or a public street—the city can not legally divert the use of such property to uses and purposes inconsistent with the purpose of such grant . . ."

*Id.* (alteration in original) (quoting *Seattle Land & Improvement Co. v. City of Seattle*, 37 Wash. 274, 276, 79 P. 780 (1905)). "Property acquired by a municipality by dedication is the same as any other municipal property, except that it cannot be diverted to any inconsistent use." 11A MCQUILLIN, *supra*, § 33.65, at 505 (citing, among other authority, *Albee v. Town of Yarrow Point*, 74 Wn.2d 453, 459-60, 445 P.2d 340 (1968)).

While no reported Washington decision has addressed the issue, cases from other jurisdictions have held that a municipality may not use parkland for a public highway. *See Village of Riverside v. Maclean*, 210 Ill. 308, 323-24, 71 N.E. 408 (1904) (village's contention that proposed roadway through park would be a "pleasure driveway" was unsupported by evidence; injunction of construction affirmed on basis that the extension of roadway through the park "will be a perversion of the use of which the premises . . . were originally dedicated"); *City of St. Louis v. Bedal*, 394 S.W.2d 391, 397 (Mo. 1965) (while proposed roadway would in some ways enhance use of park, it was still a

24

diversion from park uses; "The park was not created for surface traffic."); *and see City of Hermosa Beach v. Superior Court*, 231 Cal. App. 2d 295, 41 Cal. Rptr. 796 (1964) (recognizing taxpayer's standing to challenge construction of road across beach property deeded to city "as a public pleasure ground").

The fact that the Fred Meyer Parties joined in the amendment does not detract from Friends' ability to challenge it. "After the dedication is complete, the dedicator cannot restrict or change the uses for which it was made, or otherwise impose conditions." 11A MCQUILLIN, *supra*, § 33.10, at 340 (footnote omitted).

Friends' first four claims for relief seek to enforce the restrictions imposed by what it contends was an accepted dedication. Accepting as true the allegations of the four claims, they state a claim on which relief could be granted.

III.    Unconstitutional Gift of Public Funds

Friends also challenges dismissal of its claim that the county's amendment of the deed restrictions in order to permit construction of ingress/egress for Star Saylor's development constitutes a gift of county funds to the developer in violation of article VIII, section 7 of the Washington Constitution, which provides:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

The manifest purpose of the provision "'is to prevent state funds from being used to benefit private interests where the public interest is not primarily served.'" *CLEAN v. State*, 130 Wn.2d 782, 797, 928 P.2d 1054 (1996) (quoting *Japan Line, Ltd. v. McCaffree*, 88 Wn.2d 93, 98, 558 P.2d 211 (1977)).

No unconstitutional gift of public property occurs when funds are expended in carrying out a fundamental purpose of government. *City of Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d 679, 702, 743 P.2d 793 (1987). "Outside of expenditures for fundamental governmental purposes," article VIII, section 7 requires that we "focus on two factors to determine if a gift occurs: consideration and donative intent." *Id.* (citing *Gen. Tel. Co. of Nw., Inc. v. City of Bothell*, 105 Wn.2d 579, 587-88, 716 P.2d 879 (1986)). A project or program "must be presumed constitutionally valid, and the burden of overcoming that presumption lies with those challenging [the public entity's] authority." *Id.*

Friends' complaint includes the following allegations (among others) in support of its contention that amendment of the deed restrictions in order to permit construction of ingress/egress for Star Saylor's development constitutes a gift of county funds to the developer in violation of article VIII, section 7 of the Washington Constitution:

> 23.    Star Saylor wants to have Spokane County provide . . . it with an[ ] easement th[r]ough the Freddy Park from Standard Drive to the Developer's property adjacent to the Freddy Park southerly property line which will connect with Regina which comes to the Star Saylor property from the west.

. . . .

75. The Spokane County Commissioners desire to assist a private developer who intends to build a number of residences south of the park and bordering the park property. The Commissioners want to allow the Developers to construct a road through the park—the road is to be 34 feet wide with the paved portion 24 feet wide.

76. The proposed roadway is contingent on the construction of the development; that is, it is solely for the purposes of the development—the proposed development must have the road in order to pursue the land use of creation of multiple living units.

77. What the county intends to do is clearly a violation of Wash. Const. Art. VIII, Section 7.

CP at 21-31.

Friends argues that its allegations that the county commissioners' "desire to assist a private developer" and that the proposed roadway "is solely for the purposes of the development" sufficiently allege donative intent and that the trial court was required to treat its factual allegations as if they were true. Br. of Appellant at 18. Before *King County v. Taxpayers of King County*, 133 Wn.2d 584, 949 P.2d 1260 (1997), the Washington Supreme Court had held that donative intent is a "factual issue to be resolved by the trier of fact." *In re Estate of Little*, 106 Wn.2d 269, 288, 721 P.2d 950 (1986). Before *King County*, one might have argued—as the dissenting justices in that case did— that a plaintiff could establish an unconstitutional gift of public funds by demonstrating the government's donative intent or that it received a grossly inadequate return. *See King County*, 133 Wn.2d at 623 (Sanders, J., dissenting). Before *King County*, one might have argued, based on earlier decisions, that it was only if the plaintiff *could not* show

donative intent or gross inadequacy that the trial court should inquire into the adequacy of the consideration. *See id.* But *King County* established that such a view would be mistaken.

The seven-member majority in *King County* held that in assessing whether a taxpayer has shown that there has been a transfer of property without consideration and with donative intent, "courts do not inquire into the adequacy of consideration, but employ a legal sufficiency test," explaining,

> We have been reluctant to engage in an in-depth analysis of the adequacy of consideration because such an analysis interferes unduly with governmental power to contract and would establish a "burdensome precedent" of judicial interference with government decision making.

*Id.* at 597. And "[l]egal sufficiency 'is concerned not with comparative value but with that which will support a promise'": a question of law. *Id.* (quoting *Browning v. Johnson*, 70 Wn.2d 145, 147, 422 P.2d 314, 430 P.2d 591 (1967)). When asked at oral argument whether legal sufficiency was not the test, Friends' lawyer criticized the majority's opinion in *King County* as mistakenly applying a contract rule—that "even a peppercorn" is legally sufficient consideration to support a promise—as inadequately protecting public assets, a position reminiscent of Justice Sanders' dissent in *King County*. Unlike Justice Sanders, we are not free to disagree with the Supreme Court majority's construction of the Washington Constitution.

28

The trial court had before it Resolution No. 12-0910, adopted in November 2012, which stated that Star Saylor would be required to "'secure and construct'" the roadway and that the county, in consultation with its own traffic engineers, the Washington State Department of Transportation, and local fire district 9 had "determined that a road connection between Hastings Road and Regina Road along the Standard Drive alignment would be beneficial to area traffic circulation and relieve pressure on the Regina Road/ State Highway intersection." CP at 70. As a matter of law, private construction of a road that the county concluded would be beneficial to area traffic circulation and would relieve pressure on a state highway intersection satisfies the low "peppercorn" standard of legal sufficiency. *Cf. Northlake Marine Works, Inc. v. City of Seattle*, 70 Wn. App. 491, 507, 857 P.2d 283 (1993) (city did not violate the prohibition against gifts of public property when it conveyed an abandoned railroad right-of-way to private developers in exchange for development of public trail); *CLEAN v. City of Spokane*, 133 Wn.2d 455, 470, 947 P.2d 1169 (1997) ("Although Appellants may view the transaction as an unwise use of public funds that unduly benefits the Developers, the wisdom of the plan is not for this court to consider.").

The court was required to accept facts alleged in Friends' complaint as true but was "not required to accept the complaint's legal conclusions." *Loudeye Corp.*, 144 Wn. App. at 717-18. Because Friends' complaint and the documents legitimately considered by the court revealed legally sufficient consideration, we need not address whether

making government property available for construction of a roadway serving a residential

development is a fundamental purpose of government.

## IV.    Ineffective Execution

Friends' third assignment of error is that the court incorrectly viewed its claim that

Fred Meyer had no authority to sign the 2012 amendment as failing to state a claim upon

which relief could be granted.

The 2001 conveyance documents, whose contents the court was entitled to

consider, reveal that the Fred Meyer Parties probably always held the beneficial interest

in the property, which presumably reverted to them when Wilmington Trust was canceled

in July 2012 (as recited by Resolution No. 12-0910).[3] But a more important and

---

[3] Wilmington Trust Company executed the 2001 deed "not in its individual capacity, but solely as Owner Trustee" under a business trust. CP at 53. The Fred Meyer Parties rather than Wilmington Trust provided warranties of title. A joinder document stated that Wilmington Trust held fee title "as security for the performance of obligations owed under a synthetic lease financing vehicle" and disclosed that Roundup Company was prime lessee under a prime lease with Fred Meyer Stores Inc., Fred Meyer Stores Inc. had a prime lease with Fred Meyer Inc., and Fred Meyer Inc. had a prime lease with Wilmington Trust. CP at 56.

A synthetic lease is one under which (as relevant here) a special purpose entity (SPE) is formed to be (on paper) the owner and lessor of a facility—often a real estate project to be occupied by only the corporate user. The SPE enters into a relatively short-term lease (usually not exceeding 10 years) with the high credit rating corporate user and the terms of the SPE's agreement with the corporate user provide the mortgage lender assurance that its debt is secure while providing the corporate user with essentially all of the material benefits and burdens of ownership of the real estate. Anthony J. Luppino, *Stopping the Enron End-Runs and Other Trick Plays: The Book-Tax Accounting Conformity Defense*, 2003 COLUM. BUS. L. REV. 35, at 54-55.

threshold issue for purposes of the motion to dismiss is that this claim by Friends amounts to nothing more than a charge that the county made a contract with the wrong party. Entering into an ineffective contract is not an illegal act.

To sue the county for this asserted contracting mistake, Friends has standing only if it alleges a special injury arising from the fact that the county signed an amendment with the wrong party. But the only injury pleaded by Friends arises from the county's alleged violation of the 2001 deed, not from its execution of the amendment with the wrong party. The trial court did not err in concluding that this claim, including standing to assert it, was inadequately pleaded.

### V.    Disqualification Motion

Finally, Friends argues that the trial court erred in concluding that it failed to demonstrate that the county prosecutor's concurrent representation of the county and Fred Meyer presented a disqualifying conflict of interest. "Review of a court's decision to grant or deny a motion to disqualify counsel is a legal question that is reviewed de novo." *Sanders v. Woods*, 121 Wn. App. 593, 597, 89 P.3d 312 (2004).

In the trial court, Friends challenged the prosecuting attorney's dual representation of the county and Fred Meyer on two grounds: that (1) the representation created a conflict of interest in violation of RPC 1.7(a); and (2) even if clients consented to the dual representation, it was prohibited by law under RPC 1.7(b)(2) in that it would violate article VIII, section 7 of the Washington Constitution. On appeal, Friends makes the

31

additional argument that the county lacks statutory authority to provide legal services to a private party under RCW 36.27.020. Friends' argument regarding the prosecutor's authority under RCW 36.27.020 is raised for the first time on appeal. Consistent with our general practice under RAP 2.5(a), we decline to consider it.

RPC 1.7(a) prohibits a lawyer from representing a client if the representation of that client "will be directly adverse to another client," or if there is a significant risk that the representation of more than one client "will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." "A lawyer represents conflicting interests when, on behalf of one client, it is the lawyer's duty to contend that which the lawyer's duty to another client requires him or her to oppose." *In re Marriage of Wixom*, ___ Wn. App. ___, 332 P.3d 1063, 1072, *motion for discretionary review filed*, No. 90895-8 (Wash. Oct. 15, 2014).

Even where a concurrent conflict exists, an attorney may generally continue representing both parties by obtaining informed consent in writing from each affected client. RPC 1.7(b)(4). Nonetheless, "some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." RPC 1.7 cmt. 14. One instance in which a conflict is nonconsentable is if the representation is prohibited by law. RPC 1.7(b)(2).

A. Conflicting interests

According to Friends, the prosecutor's dual representation creates an inherent conflict "in the divided loyalties." Br. of Appellant at 23. Friends relies on *Lettley v. State*, 358 Md. 26, 746 A.2d 392 (2000), in which the court held that a lawyer's simultaneous representation of a criminal defendant and another client, who allegedly confessed to the crime with which the defendant was charged, created a conflict of interest depriving the defendant of effective assistance of counsel. The court referred to "[the defendant's] right to undivided loyalty and assistance." *Id.* at 43.

The fundamental error in Friends' analysis of conflict of interest is that it proceeds from the position Friends believes the county *should be taking* with respect to the 2001 deed and restrictions: namely, that the county holds the park property in trust, particularly for nearby county residents, and that Fred Meyer has no continuing interest that enables it to participate in an amendment. Friends then contrasts that position with the position that Fred Meyer is taking: that it has a continuing property interest enabling it to amend the park deed to permit construction of a road. To determine whether a conflict of interest exists, however, the trial court properly considered the position that the county *was in fact taking*, as determined by its duly-elected board of county commissioners. Washington statutes "essentially require the prosecutor to maintain a certain degree of allegiance to the county commissioners, insofar as the county commissioners are the

body that exercises county 'powers' . . . and adopts the official county position on legal issues." *Osborn v. Grant County*, 130 Wn.2d 615, 627, 926 P.2d 911 (1996).

As evidenced by the Board's 2012 resolution and both parties' execution of the November 2012 amendment, the parties' objectives in this litigation have been aligned. The prospect that the county might prove to be mistaken in some of the legal positions taken is not a factor for the court to consider in weighing disqualification. The county is entitled to be represented by a lawyer willing to advocate for the position adopted by the county commissioners if there is a basis in law and fact for doing so that is not frivolous. *See* RPC 3.1 (lawyer's duty to advance meritorious claims and contentions). The trial court did not err in concluding that the county's and Fred Meyer's interests were not conflicting.

## B. Prohibited representation

Friends argues in the alternative that the prosecuting attorney should have been disqualified from representing Fred Meyer because for the county to provide legal services to a private party violates article VIII, section 7 of the Washington Constitution. We have already discussed the fact that after *King County* we examine only whether the governmental body received consideration sufficient to support the existence of a contract, an issue of law. The allegations of Friends' complaint and the content of documents properly considered by the court demonstrate that the county's promise to

34

defend Fred Meyer in the event of litigation was given in return for legally sufficient consideration: Fred Meyer's execution of the amendment.

We affirm the trial court's denial of Friends' motion to disqualify; its dismissal of count five of Friends' amended complaint, which we construe to allege creation of an actual trust;[4] and its dismissal of count six of Friends' amended complaint, alleging a violation of article VIII, section 7 of the Washington Constitution. We otherwise reverse and remand for proceedings consistent with this opinion.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

---

[4] Local governments are sometimes referred to by statutes, courts, and text writers as "trustees" of dedicated land. A helpful discussion of the prevalent theory that the property rights created are of a nontrust character appears in *Hermosa Beach*, 231 Cal. App. 2d at 297. Friends' claim based on the deed restrictions and asserted dedication is adequately pleaded in the first four counts of its amended complaint.